UNITED STATES *v.* RYAN.

No. 281.   Argued January 19, 1956.—Decided February 27, 1956.

*Oscar H. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Olney, Beatrice Rosenberg* and *Richard J. Blanchard.*

*Louis Waldman* argued the cause for respondent.   With him on the brief were *Seymour M. Waldman* and *Martin Markson.*

*Pierce Butler, John C. Benson* and *M. J. Doherty* filed a brief, as *amici curiae,* supporting respondent.

MR. JUSTICE CLARK delivered the opinion of the Court.

The question for decision in this case is whether the president and principal negotiator of a labor union is a "representative" of employees within the meaning of § 302 (b) of the Labor Management Relations Act of 1947. 61 Stat. 136, 29 U. S. C. § 141. That section makes it unlawful for "any representative of any employees" to receive money or other thing of value from the employer. The District Court, 128 F. Supp. 128, held that respondent Joseph P. Ryan was a "representative" within the meaning of § 302 (b), but the Court of Appeals for the Second Circuit reversed, Judge Hand dissenting. 225 F. 2d 417. Because of the importance of this question in the administration of the Act, we granted certiorari, 350 U. S. 860.

Ryan was president of The International Longshoremen's Association (ILA) during the years 1950 and 1951. The ILA and its affiliated groups were the recognized collective-bargaining agents for longshore labor in the Port of New York, and bargained through a wage scale committee of which Ryan was a member. He signed the agreements negotiated during that period. J. Arthur Kennedy & Son, Inc., and Daniels & Kennedy, Inc., were concerns engaged in stevedoring operations; their employees were members of the ILA, and they were bound by the agreements negotiated with that union by the New York Shipping Association. The District Court found that James C. Kennedy, president of both Kennedy companies, had given Ryan $1,000 in December of each year from 1946 through 1951, and $500 in April 1951. These findings are not disputed. Ryan was indicted under § 302 (b) for accepting the one 1950 and two 1951 payments.[1] He was found guilty and sentenced to

---

[1] The previous section, 302 (a), makes it unlawful for any employer "to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees

six months' imprisonment on each of the three counts, the sentences to run concurrently, and fined $2,500.

The Court of Appeals reversed solely on its interpretation of the term "representative" in § 302 (b) of the LMRA. It concluded that the term had a technical meaning in labor legislation and was limited to "the exclusive bargaining representative" of the employees, which in this case was the ILA itself. Since the section applied only to the "representative," payments to Ryan individually were not covered even though as president of the representative union, he was a member of its wage scale committee and signed all negotiated agreements. We do not decide whether any official of a union is *ex officio* a representative of employees under § 302. We believe, however, that respondent's relationship brings him within that term.

The LMRA provides that the term "representative" shall have "the same meaning as when used in the National Labor Relations Act as amended by this Act." § 501 (3). The pertinent definition appears in § 2 (4) of the NLRA: "The term 'representatives' includes any individual or labor organization." 49 Stat. 449, 450, 29 U. S. C. §§ 151, 152 (4).

The Board has held that employees may choose to elect an individual as exclusive or sole bargaining representative.[2] The Court of Appeals, laying much stress on these holdings, assumes that the possibility of such a one-man exclusive bargaining representative, though extremely rare,[3] is the only reason for the inclusion of the word "indi-

who are employed in an industry affecting commerce." The record does not disclose whether the Government has taken any action under this section against the employers involved.

[2] See *The Robinson-Ransbottom Pottery Co.*, 27 N. L. R. B. 1093; *Louisville Sanitary Wiper Co.*, 65 N. L. R. B. 88.

[3] Statistics supplied by the NLRB for the last two years show that one-man exclusive bargaining representatives constitute less than

vidual" in this definition. We cannot accept such an anomalous view. It is obvious that any labor organization, even when serving as an exclusive bargaining representative, can negotiate, speak, and act only through individuals. All collective bargaining is conducted by individuals who represent labor and management. Many limitations or prohibitions upon labor organization action can be effective only if there are corresponding limitations or prohibitions on the individuals who act for the labor organization. Congress, we believe, placed the identical limitations on both individuals and organizations by terming both "representatives" of employees in § 2 (4). We agree with Judge Hand that in using the term "representative" Congress intended that it include any person authorized by the employees to act for them in dealings with their employers.

Considering the precise words of the statute—"any representative of any employees"—it is plain that their literal meaning strongly suggests that they were meant to include someone in the position of respondent Ryan who represented employees both as a union president and principal negotiator. And this interpretation is strengthened by a consideration of the full text of § 302.[4]  Para-

---

0.1% of all representatives certified by the Board. In fiscal year 1955, the Board certified 1 individual in 2,904 elections in which representatives were chosen. There were 10 petitions for certification filed by individuals in 4,372 elections. In fiscal 1954, 5 individuals were certified in 3,108 elections in which representatives were chosen. There were 11 such petitions and a total of 4,813 elections.

[4] "SEC. 302. (a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

"(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.

"(c) The provisions of this section shall not be applicable (1) with

graphs (a) and (b) of § 302 make it unlawful for any employer to offer, or any representative to accept, money or other thing of value. Paragraph (c) lists five exceptions to these broad prohibitions. The first exempts payments as compensation for services "to any representative who is an employee" of the employer. Thus it is clear that § 302 anticipates that a "representative" may be an individual. Of the remaining four exceptions, one could

---

respect to any money or other thing of value payable by an employer to any representative who is an employee or former employee of such employer, as compensation for, or by reason of, his services as an employee of such employer; (2) with respect to the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress; (3) with respect to the sale or purchase of an article or commodity at the prevailing market price in the regular course of business; (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner; or (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided*, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration

apply only to unions but each of the other three could apply as readily to individuals.[5]

Further, a narrow reading of the term "representative" would substantially defeat the congressional purpose. In 1946 Congress was disturbed by the demands of certain unions that the employers contribute to "welfare funds" which were in the sole control of the union or its officers and could be used as the individual officers saw fit. The United Mine Workers' demand that mine

---

of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities.

"(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both. . . ." 61 Stat. 157, 29 U. S. C. § 186.

[5] Subsection (4), relating to check-off payments for union dues, presupposes that the "representative" is the labor union itself. Subsections (2), relating to payments of judgments or arbitration awards, (3), relating to purchase or sale of goods in the ordinary course of business, and (5), relating to payments to trust or welfare funds, however, are consistent with either interpretation of the term "representative."

operators create a welfare fund for the union by contributing 10 cents for each ton of coal mined, caused the Congress to act. The Case Bill, H. R. 4908, 79th Cong., 2d Sess., which regulated welfare funds in a manner similar to § 302, was enacted in 1946, but was vetoed by the President. The following year the Taft-Hartley Act containing § 302 was passed over another veto. But, if "representative" means only the "exclusive bargaining representative," the explicit limitations on welfare funds in § 302 (c)(5) may be easily evaded. Payments made directly to union officials, or to other individuals as trustees, would apparently be excluded from § 302. Thus, a narrow construction would frustrate the primary intent of Congress.

Nor can it be contended that in this legislation Congress was aiming solely at the welfare fund problem. Such a suggestion is supported neither by the legislative history nor the structure of the section. The arrangement of § 302 is such that the only reference to welfare funds is contained in § 302 (c)(5). If Congress intended to deal with that problem alone, it could have done so directly, without writing a broad prohibition in subsections (a) and (b) and five specific exceptions thereto in subsection (c), only the last of which covers welfare funds. As the statute reads, it appears to be a criminal provision, *malum prohibitum,* which outlaws all payments, with stated exceptions, between employer and representative.

The legislative history supports these conclusions. As passed by the House of Representatives, the Hartley Bill forbade employer contributions to union welfare funds, and made it an unfair labor practice to give favors to "any person in a position of trust in a labor organization . . . ." H. R. 3020, 80th Cong., 1st Sess., § 8 (a)(2). The scope of this bill was enlarged when it reached the Senate to include, in the words of Senator Taft, a "case

where the union representative is shaking down the employer . . . ." 93 Cong. Rec. 4746. The resulting Senate amendment made it criminal both for the employer and the "representative" of employees to engage in such practices.

It is not disputed that the plain language of the Senate version of the bill brought within its coverage any individual who dealt with an employer on behalf of two or more of the latter's employees concerning employment matters. As passed by the Senate, § 302 contained a special definition of the term "representative." [6] The Joint Conference Committee substituted for it the definition of that term in the NLRA, as amended. § 501 (3). This substitution was among those described by the Joint Conference Committee Report as "minor clarifying changes." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., at 67.

We cannot read this history as supporting the conclusion that the scope of § 302 was limited by the Joint Conference to include only the "exclusive bargaining representative" of employees. Such a change would have drastically reduced the scope of the section, and could hardly be described as a "minor clarifying" change. Certainly, in the face of this legislative history, we should not reduce the legislation to a practical nullity.

It is insisted that this interpretation clashes with the use of the term "representative" in various sections of the NLRA. In the majority of the examples given, the scope of the term is made clear by other words in the pro-

---

[6] Section 302 (g) of the Senate version stated, "For the purposes of this section, the term 'representative' means any labor organization which, or any individual who, is authorized or purports to be authorized to deal with an employer, on behalf of two or more of his employees, concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work . . . ."

visions themselves.[7] But further, the provision in the LMRA that "representative" shall have its NLRA meaning is no more applicable to § 302 than to any other section of the LMRA, and in several other sections of that Act it is patent that "representative" cannot be construed to include only the exclusive bargaining representative. For example, § 204 (a) refers to "employers and employees and their representatives," and § 211 (a) refers to "interested representatives of employers, employees, and the general public." There are other examples, but these are sufficient. If the severely restricted construction contended for the word "representative" is inapplicable to one section of the LMRA, there is no compulsion to apply it to any other section.

We conclude, therefore, that § 302 prohibits payments by employers to individuals who represent employees in their relations with the employers. The judgment is

*Reversed and remanded.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

---

[7] Examples are, § 1, "designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment," § 7, "to bargain collectively through representatives of their own choosing," § 8 (b)(4)(B) and (C), "a labor organization as the representative of his employees," § 8 (b)(4)(D), "bargaining representative for employees."