Arthur R. WEIR, individually and upon behalf of all individual members of Chicago Plastering Institute, Inc., a corporation, et al., Plaintiffs,

v.

CHICAGO PLASTERING INSTITUTE, INC., a corporation, Defendant.

and

EMPLOYING PLASTERERS' ASSOCIATION OF CHICAGO, Plaintiff,

v.

JOURNEYMEN PLASTERERS' PROTECTIVE AND BENEVOLENT SOCIETY OF CHICAGO, LOCAL NO. 5, et al., Defendants.

Nos. 59C726, 59C779.

United States District Court
N. D. Illinois, E. D.
Oct. 16, 1959.

Seyfarth, Shaw, Fairweather & Geraldson, Parkhill, Severns & Stansell, Kenart M. Rahn, Henry E. Seyfarth, Matthew E. Murray, Joseph E. Wyse, and Wilfred F. Rice, Jr., Chicago, Ill., for plaintiffs.

Kirkland, Ellis, · Hodson, Chaffetz & Masters, William T. Kirby, Thomas M. Thomas, J. B. Martineau, Hugh McCarthy, John J. Enright, Chicago, Ill., for defendants.

CAMPBELL, Chief Judge.

This consolidated cause is now before me upon defendants' motions for judgment at close of plaintiffs' case pursuant to Title 28 U.S.C., Rule 41(b). Cause No. 59 C 726 began originally in the Circuit Court of Cook County, Illinois, as a complaint in chancery by plaintiffs, Arthur Weir and Quikbrik Co., to dissolve defendant, Chicago Plastering Institute, Inc. (hereinafter referred to as the Institute), under the provisions of Chapter 32, Illinois Revised Statutes, Section 163a53(a) (2), on the grounds that the acceptance of contributions by the Institute was illegal under Section 302 of the Labor Management Relations Act of 1947, Title 29 U.S.C.A. § 186. The cause was subsequently removed to this Court because of the alleged violation of Section 302. In Cause No. 59 C 779, plaintiff, Employing Plasterers' Association of Chicago (hereinafter referred to as the Association), is suing defendants, Journeymen Plasterers' Protective & Benevolent Society of Chicago, Local No. 5 (hereinafter referred to as Local No. 5), and the Institute, et al., directly under the provisions of Section 302(e) of the Labor Management Relations Act of 1947, Title 29 U.S.C.A. § 186(e) for injunction, accounting, appointment of receiver and other relief.

Plaintiff Association is a non-profit corporation composed of certain plastering contractors in the Chicago area. For approximately thirty years it has negotiated on behalf of some management, collective bargaining agreements with defendant, Local No. 5, which represents the employees of its members. Defendant Institute was incorporated December 18, 1944, on application of Byron Dalton, Herman J. Mutter, and Stephen Luczak. Dalton and Mutter were at that time members of Local No. 5, while Luczak was a plasterer contractor and member of plaintiff Association. From its incorporation until December 7, 1945, the purposes for which the Institute was organized were as follows:

"The advancement of plaster construction over inferior substitutes, by (1) education of the public, and (2) by sponsoring legislation calculated to preserve the health and safety of the public by the use of plaster construction, and (3) discourage attempts to pass legislation derogatory to plaster construction, and (4) to do those things which are necessary and proper to promote and enhance the plastering industry."

On December 7, 1945, these purposes were amended as follows:

"5. Benevolent and charitable, and in furtherance of same, but in limitation thereof, and obtaining, through others, of hospital, death and other benefits for members of the corporation employed by contractors engaged in the business of plastering construction.

"The above shall not include the payment of any direct sick or death benefits by the corporation, nor shall it be deemed to authorize the corporation to perform any of the functions of an insurance company."

Pursuant to the above by-laws, the Institute is alleged to administer three funds: (1) a General Fund; (2) a Benevolent Fund; and (3) a Pension Trust. Members of plaintiff Association and other employers have made payments to these funds in amounts calculated by the amount of work performed for each employer by employee members of Local No. 5 since October 25, 1945, in accordance with labor agreements between Local No. 5 and plaintiff Association and other plastering contractors. The Institute by-laws provide for two classes of membership. "Institute Members" are composed of Local No. 5 and Employers employing members of Local No. 5 who make contributions to the Institute in accordance with the by-laws. "Beneficial Members" who are to receive the benefits as provided in the by-laws, are those members of Local No. 5 in "good standing" and "employed by an Institute member." The Board of Directors manages the Institute business and is composed of eight directors, four representing employer groups in Chicago

and Cook County, and four representing Local No. 5. If the Board of Directors should become deadlocked in voting, the president of the Institute, an "ex officio" member of the Board of Directors, may cast the deciding vote. It is further provided that "the number of Institute membership votes awarded to the Local Union, through its representatives, shall be equal to those of the employers present and voting." Members of plaintiff Association have always been on the Board of Directors of the Institute as part of the employer group. Byron Dalton, who has been elected and re-elected president of the Institute since its inception, was also president of Local No. 5 from 1951 to 1955.

It is plaintiff Association's contention that the evidence shows that the Institute is a "representative" of employees within the meaning of Section 302, and that employer contributions to the Institute are in violation of Section 302 because the above funds are not administered by the Institute in accordance with Section 302.

As to plaintiffs, Quikbrik Co., and its president, Arthur Weir, in cause No. 59 C 726, it is their contention that, having hired a member of Local No. 5 in 1952, and having made a payment of $8.25 to the Institute, one of them became an "Institute Member," or both of them became "Institute Members." They further maintain that as an "Institute Member" or "Members," they are, or one of them is, entitled to maintain this class action on behalf of "Institute Members" for dissolution of defendant Institute under the appropriate Illinois statute. Plaintiffs Weir and Quikbrik Co., adopt the arguments of plaintiff Association and maintain as well, that the Institute administration of employer contributions is illegal under Section 302.

Section 302(a) of the Labor Management Relations Act of 1947 provides:

"It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce."

Conversely, by virtue of Section 302 (b) it is unlawful for any representative of any employees to receive or accept, or to agree to receive or to accept, from the employer of such employees any money or other thing of value. Under Section 302(c) of the Act, this broad prohibition is made inapplicable in five situations, one being, "with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer * * *" provided that the trust fund meets certain standards specified in that subsection.

As stated by the United States Supreme Court in Arroyo v. United States, 359 U.S. 419, at page 425, 79 S.Ct. 864, at page 868, 3 L.Ed.2d 915:

"Section 302 had its origin in an amendment to the Case bill, H.R. 4908, 79th Cong., 2d Sess., proposed by Senator Byrd, 92 Cong. Rec. 4809, which prohibited payment by an employer, or receipt by a representative, of any money or other thing of value unless the payment was for wages or for union dues withheld by the employer under a checkoff agreement. After several modifications, including one substantially similar to subsection (c) (5) which was proposed by Senators Taft and Ball, the amendment was agreed to by the Senate, 92 Cong.Rec. 5521–5522, and the Case bill passed. 92 Cong. Rec. 5739. The House accepted the Senate amendments, 92 Cong.Rec. 5946, but the President vetoed the bill, 92 Cong.Rec. 6674–6678, and it failed of passage over his veto. 92 Cong.Rec. 6678.

"In the Eightieth Congress the Senate Committee on Labor and Public Welfare reported out an original bill, S. 1126, containing no reference to payments by an employer to a representative other than that which had been contained in § 8(2) of the Wagner Act. A minority of

the Committee, including Senators Taft and Ball, filed their 'Supplemental Views' in which they stated their intention to offer from the floor 'an amendment reinserting in the bill a provision regarding so-called welfare funds similar to the section in the Case bill approved by the Senate at the last session.' S.Rep.No. 105, 80th Cong., 1st Sess., p. 52. The amendment was adopted by the Senate, 93 Cong.Rec. 4754, accepted by the Conference Committee, H.R. Rep.No. 510, 80th Cong., 1st Sess., pp. 24–25, 67, and enacted as § 302 of the Labor Management Relations Act."

In my opinion, the legislative history of both the above amendments is pertinent in determining the intention of Congress in the enactment of Section 302.

■ As clearly shown by the Congressional debates, Congress had a threefold purpose in enacting Section 302: (1) Fundamentally, as indicated by plaintiffs in their briefs and arguments, Congress was concerned with the protection of welfare funds for the benefit of employees. 92 Congressional Record, pp. 5345, 5346; 93 Congressional Record, pp. 4678, 4679, 4746, 4753. (2) Congress was also concerned with the corruption of collective bargaining through bribery of employee representatives by employers and extortion by employee representatives. 92 Congressional Record, pp. 4893, 5428; 93 Congressional Record, p. 4678; Arroyo v. United States, supra, 359 U.S. at pages 425, 426, 79 S.Ct. 864, (3) Congress was further concerned with so-called Union "war chests" and the possible abuse by Union officers of the power they might achieve if welfare funds were left to their sole control. 92 Congressional Record, pp. 4893, 4894; 93 Congressional Record, p. 4678, Arroyo v. United States, supra, 359 U.S. at page 426, 79 S.Ct. 864. Necessarily, any interpretation of Section 302 must correlate to these expressed Congressional aims.

■ Having determined general Congressional intention, two more specific factors are immediately obvious from Section 302 itself and from its legislative history. First, Section 302, on its face, is fundamentally a criminal enactment, *malum prohibitum*. Throughout the debates as found in 92 and 93 Congressional Record, there is constant reference to the criminal penalty, but only rarely to Section 302(e) which refers to the power of district courts, "for cause shown * * * to restrain violation of this section" without regard to the broad anti-injunction provisions of the Clayton Act, 15 U.S.C.A. § 12 et seq., and the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq. For example, in 92 Congressional Record at Page 4893, Senator Byrd states that United States district courts, "in addition to the criminal penalty can grant injunctions" while in 93 Congressional Record at Page 4678, Senator Ball says: "Subsection (e) gives the district courts jurisdiction to restrain and to punish violations of the section * * *" It would not be a strained construction of this language to hold that any action under subsection (e) would have to be collateral to a criminal action. I might here add that in at least one decision the Court has felt that Section 302(e) "lifted the bar of the Norris-LaGuardia Act to vest certain injunction powers in the courts *when the National Labor Relations Board initiated* the court proceedings." (Emphasis supplied.) A. H. Bull Steamship Co. v. Seafarer's International Union, 2 Cir., 250 F.2d 326, 330.

■ Apart from this, however, it is clear that Congress primarily intended compliance with Section 302 through the medium of a criminal sanction. The second factor embodied in a case of this nature is the inherent role of collective bargaining in labor disputes wherein by arbitration or by friendly agreement and cooperation between management and labor their differences may be resolved. Philosophically and traditionally, labor disputes have always been settled by the parties, and courts have always been re-

luctant to interfere. In enacting Section 302, Congress was well aware of this tradition and its underlying philosophy. Illustratively, I quote from Senator Thomas, 93 Congressional Record, Page 4680, in referring to subsection (e):

> "Is not this an invitation to resort to the courts in labor disputes? Does it not again open the courts, which have been denied the right to issue injunctions, to labor disputes? * * *. This is really a proposal to permit the advantage-taker to develop some kind of a case which will be embarrassing to labor, and get the case into court, whether it be a worthy case or not, thus holding up the process of growth and development in this field."

Senator Pepper at 93 Congressional Record, Page 4680, states:

> "These disputes are not settled in court; they are settled by amicable accord and understanding between management and labor."

It is clear from such expressions that Congress did not intend, by Section 302, to open the floodgates into the federal courts for every labor grievance concerning "payments to representatives," but rather intended a strict construction of subsection (e). This construction, which, I might add, is in keeping with the general effort of Congress to further limit the jurisdiction of overcrowded federal courts, raises the following questions:

> (1) Who is entitled to invoke subsection (e)? In other words, do the district courts have *jurisdiction* to entertain a suit to "restrain violations" of Section 302 brought by just anybody, or did Congress intend that jurisdiction under subsection (e) is limited by virtue of the status of the plaintiff?

> (2) Under what circumstances did Congress intend that violations of Section 302 should be restrained?

> (3) What is the scope of the relief intended by subsection (e)?

Before hearing any evidence in this consolidated cause, I noted for counsel what, in my opinion, I felt to be the major issues before the Court. The first such issue outlined was: "Are the plaintiffs, or either of them, entitled to bring this action?" Basically, I was concerned with the jurisdiction of this Court to entertain this consolidated cause under Section 302. In other words: Does this Court in Cause No. 59 C 726 have *jurisdiction* to entertain a suit removed from a state court because of alleged violation of Section 302 when that suit is brought by an alleged employer-member of defendant Institute and seeks by way of chancery decree to dissolve defendant Institute under the appropriate Illinois statute? Does this Court in Cause No. 59 C 779 have *jurisdiction* to entertain a suit for injunction, accounting, appointment of receiver and other relief, when such suit is brought under Section 302(e) against defendant Institute and Local No. 5 by an association of employers who are contributing members of defendant Institute?

The jurisdictional limitation of Section 302(e) in regard to who may "restrain violations" of that section is, in my opinion, plainly indicated in the Congressional debates. Plaintiff Association in its brief and oral argument (Transcript, pp. 675–679), has referred to certain of these debates. It quotes from 93 Congressional Record, page 4678, the remarks of Senator Ball:

> " * * * it shall be in the nature of a trust fund, so that the *employees* receiving benefits from it *will have a right to go into court to protect their interest in such benefits, if necessary.*" (Emphasis supplied.)

It also quotes from the committee report at 93 Congressional Record, Page 4679, as read by Senator Pepper:

> " * * * be, in fact, trust funds for the *employees*, with definite benefits specified, *to which employees are clearly entitled, and to obtain which they have a clear legal remedy.* The amendment proceeds on

the theory that union leaders should not be permitted, *without reference to the employees* to divert funds paid by the company, *in consideration of the services of employees*, to the union treasury or the union officers, *except under the process of strict accountability*." (Emphasis supplied.)

It further quotes from 93 Congressional Record, Pages 4746, 4747, the remarks of Senator Taft:

"In other words, this must be a trust fund. It cannot be the property of the union without a definite statement that it is in *trust for the employees*, who, after all, *have earned the money*."

"The purpose of ·the amendment is to require that the· fund shall be established in definite, detailed form, in the form of a trust fund, with respect to which the *employees can determine their rights and can insist upon them*." (Emphasis supplied.)

To plaintiff's references, I should like to add the remarks of Senator Ball at 92 Congressional Record, Page 5345:

"So, first, we make this a trust fund so that *any individual employee* having a right to benefits under that fund, *if he is denied them by the administrators thereof, has the right to go into court and to see that he gets his rights under that fund*." (Emphasis supplied.)

The remarks of Senator Pepper at 93 Congressional Record, Page 4679:

"The other question is, primarily, Who should have the administration of such funds? For whose benefit are the funds established? *They are established for the benefit of the workers*. Is it not reasonable to suppose that if the funds are for the benefit of the workers, *the workers will be the ones chiefly concerned in their proper administration and disbursement? Can any union leader escape accountability, first, to the law, and secondly, to his own union membership, for the misuse, misap-*plication, or diversion of welfare funds?" (Emphasis supplied.)

The remarks of Senator Taft at 93 Congressional Record, Page 4746:

"So that the purpose of the provision is that the welfare fund shall be a perfectly definite fund, that its purpose shall be stated so that *each employee can know what he is entitled to, can go to court and· enforce his rights in the fund*, and that it shall not be, therefore, in the sole discretion of the union or the union leaders and usable for any purpose which they may think is to the advantage of the union or the employee."

"The employee has nothing to say about it. Certainly he is entitled to have us say that the fund shall be definite, that his rights shall be determined by law, and *that he shall be able to demand them*."

The remarks of Senator Ives at 93 Congressional Record, Page 4748:

"I happened to observe at the hearings held last winter that *there was serious objection on the part of some very large employers to having any part in the administration of welfare funds. That is understandable. They feel that such funds are for the benefit of the employees;* their relationship is a happy one, and they would rather leave it that way." (Emphasis supplied.)

The remarks of Senator Ball at 93 Congressional Record Page 4753:

"Mr. President, *all we seek to do by the amendment is to make sure that the employees whose labor builds this fund and who are really entitled to benefits under it shall receive the benefits; that. it is a trust fund, and that, if necessary, they can go into court and obtain the benefits to which they are entitled*." (Emphasis supplied.)

The exchange between Senator Taft and Senator Ferguson at 93 Congressional Record, Page 4753:

"*Mr. Taft:* The answer is that the amendment requires that there

be specified in the agreement the exact terms under which the benefits are to be received. The complete terms with respect to benefits must be set out in the agreement. *If it is only a trust fund for welfare purposes, with no specific terms or regulations, a court of chancery cannot write a welfare fund system into it. The court has no power to do that. No single employee can bring suit under such a general fund provision and prove that he personally has any rights whatever in the fund.*

"*Mr. Ferguson:* I had in mind that at least he could require an accounting under the terms of the fund.

"*Mr. Taft: Yes; he could require an* accounting, but the accounting may show that the money has been spent to establish a school in some district or provide an advantage to a certain number of individuals to whom the union wanted to give money, and not to others. *He would have no individual rights unless there were provision in law for the inclusion of specific terms.*" (Emphasis supplied.)

Finally, the remarks of Senator Tunnel at 92 Congressional Record, Pages 5426–5428, should be noted, which are to the effect that in cases of this nature, the employer needs no protection from Congress. Parenthetically, it may be observed that the Congressional debates preceding the case bill as found in 92 Congressional Record, are concerned to a greater extent with the danger of bribery and union "war chests," while the debates preceding Section 302 as found in 93 Congressional Record, are, for the most part, concerned with the administration of welfare funds for the benefit of employees with the emphasis upon the right of employees to such funds.

It cannot be questioned that two of the funds allegedly administered by the defendant Institute, the Pension Trust and the Benevolent Fund, are for the benefit of employees. In the words of plaintiffs Weir and Quikbrik (Transcript, Page 634), "* * * seventeen cents an hour earned by members of Local 5, the seventeen cents which they could have gotten * * *", or plaintiff Association quoting Senator Taft (Transcript, Page 679), "* * * it is in trust for the employees who, after all, have earned the money." Yet, in this consolidated cause, there has been no evidence that the beneficiaries of these funds are dissatisfied. The record is clear of any objection by any employee or any member of Local No. 5. As plaintiffs, Weir and Quikbrik Co., have stated (Transcript Pages 631–634):

"There is approximately $1,700,-000 in the treasury of the Institute, much of it earmarked for benevolent funds for the benefit of members of the Chicago Plastering Institute. They are unrepresented in this litigation."

"Certainly, the members of Local 5 are not notified about this retention of commissions. That is the members' money. Adequately to represent the beneficial members of Local 5, it would seem that Mr. Kirby, Enright, and McCarthy ought to be sitting on our side of the table. They ought to be objecting to the use of members' funds. Apparently they are not."

"Whose money is being used for that? Members of Local 5. Yet, there hasn't been one objection whatsoever by any representative of the beneficial members."

"Again, members' money. Nothing has been done about it by the members of Local 5 or the beneficial members."

I join with plaintiffs in this query. Plaintiffs, Weir & Quikbrik, have attempted to maintain by way of briefs and oral argument that they represent the "beneficial members" of the Institute. Not only is their complaint free from this allegation, but such a position is untenable on the facts of this cause.

696

■ To summarize: Section 302 was enacted to prevent union-management corruption, to prevent powerful union "war chests" and to insure the proper administration of "earned" employee "wages" in the form of welfare funds. Congress, well aware that labor disputes do not belong in the federal courts and in the midst of a general effort to further limit the jurisdiction of over-crowded federal courts, did not intend to open the floodgates of federal courts to every labor grievance concerning payments to "representatives" of employees. Primary enforcement of Section 302 was left to the Department of Justice, while subsection (e) was enacted primarily for the express purpose of giving employees the right to challenge the administration of their funds in the federal courts. Such a conclusion is logical for many reasons. First, union-management corruption, bribery, extortion or union "war chests" are properly the concern of the Department of Justice since in all these cases, the public is vitally involved. However, when it comes to the administration of welfare funds, the public interest is only equal to, if not secondary to the interests of employees because such funds are earned by employees and belong to employees. It is illogical to presume, in the ordinary case, that Congress intended that anyone other than employees should be allowed to invoke subsection (e) in the federal courts. Second, it is hornbook law that only the beneficiaries of such funds have the right to pursue the remedy sought by plaintiff Association. Scott, Trusts (2d Ed.1956) Vol. II, Sec. 197–200, pp. 1486–1502. Employees are the rightful owners and beneficiaries of such funds. Third, there are a number of civil remedies available in the state courts to which parties indirectly affected by a violation of Section 302 may seek their remedy. As an example, I cite Cause No. 59 C 726. Congress did not intend that this indirect burden fall upon the federal courts. Fourth, as pointed out by Congress, employers are well able to protect themselves from union abuse by collective bargaining agreements and, as in this case, by membership on the administrative board of the fund. Fifth, if the theory is, as plaintiffs maintain, that welfare funds are "wages" "earned" by employees in accordance with collective bargaining agreements, then it is preposterous for employers to seek injunctive relief against payment of such funds to the Institute when, in point of law, these funds do not belong to the employers, but rather to the employees. It is equally preposterous to seek injunctive relief when members of plaintiff Association are directors of the Institute and charged with the administration of such funds.

For the above reasons, it is clear that, in regard to the Pension Trust and Benevolent Fund, Congress intended by subsection (e) to give a civil remedy to employees, but certainly not in the ordinary case, to employers.

■ I now consider the General Fund. It is apparent at this point that Congressional aims necessarily vary the interpretation of subsection (e). The purpose of the General Fund in the instant cause is to absorb administrative expenses and to defray the costs of promotional activity. But since the by-laws of defendant Institute provide that, at the directors discretion, a variable amount may be distributed between the General Fund and Benevolent Fund and that any amount, up to 40 per cent of gross proceeds from contributions may be spent for General Fund purposes, it follows that *employees* may find a remedy in subsection (e). However, since employers have an interest in the promotional activity of defendant Institute, does subsection (e) likewise provide them with a civil remedy in regard to the General Fund? I think not. Congress, besides protecting welfare funds, intended to prevent union-management corruption, extortion and union "war chests." It expressly relegated this duty to the Department of Justice and necessarily, subsection (e) must supplement this intention except, as I have pointed out, in regard to welfare funds. I do not here

say that subsection (e) is applicable only upon the initiation of proceedings by the Department of Justice or the National Labor Relations Board as stated in the Bull Steamship case, supra. However, I am of the opinion that Congress did not intend, in the ordinary case, that, an employer, who, as the debates indicate, is well able to protect himself, should be able to attack, in the federal courts, the administration of a general fund by virtue of subsection (e). Such suits rightly belong in the state courts.

I am well aware of decisions under which employers or employer associations have maintained actions under Section 302. Mechanical Contractors Association of Philadelphia, v. Local Union 420, 3 Cir., 265 F.2d 607; Sheet Metal Contractors Association v. Sheet Metal Workers International Association, 9 Cir., 248 F.2d 307; Conditioned Air & Refrigeration Co. v. Plumbing & Pipe Fitting Labor-Management Relations Trust, D.C., 159 F.Supp. 887. Also see Shapiro v. Rosenbaum, D.C., 171 F.Supp. 875 (a stockholders derivative suit.) Besides great and distinguishing factual differences, these decisions do not deal with the jurisdictional limitations of subsection (e) as expressed above and are therefore not in point here. I have stated that subsection (e) does not give a remedy to employers *in the ordinary case*. I simply mean that the jurisdiction of this Court to entertain a cause of action under subsection (e) is dependent upon the allegation and proof, of a direct, personal relationship to the expressed aims of Congress.

Since, for example, neither the pleadings nor the evidence in this consolidated cause indicate *extortion* on the part of Local 5 or the Institute as against plaintiffs in regard to collective bargaining for the funds in question, I am not called upon here to decide whether such circumstances would create a cause of action which falls within the jurisdictional purview of subsection (e). Sheet Metal Contractors v. Sheet Metal Workers International Association, supra. Even if the jurisdictional purview of subsection

(e) should be construed to extend to such a suit, I would have to hold that the complaint fails to state a claim upon which relief may be granted since no such claim is alleged. Nor has any evidence been introduced here to prove such a claim. Even assuming a violation of Section 302 in the instant cause, it is my opinion based upon the pleadings and evidence, that any action taken under that Section would necessarily have to be taken by the Department of Justice or by Local 5 employees under subsection (e). These plaintiffs must be left to their general remedies in the state courts.

I hesitate to end abruptly here as would be my policy in the ordinary case where the Court is found to be lacking in jurisdiction. The parties not only have shown an eager cooperation in reaching an early trial and promoting the stipulation of a major part of the evidence, but they have, as well, submitted many briefs to aid the Court in resolving the difficult questions of law presented in this cause. I feel it to be in the interest of justice to attempt an answer of the several issues remaining as I originally outlined them for the parties.

Defendant Institute by way of additional defenses has raised the doctrine of "unclean hands" and "laches."

The evidence shows that Mr. Stephen Luczak, a contractor and member of plaintiff Association, was one of the three Institute incorporators and occupied the position of secretary of the Institute, an "ex-officio" member of the Board of Directors, until his death. Plaintiff Association originally appointed one "Mr. Anderson" to the Board of Directors of the Institute who served a short period of time. Subsequently, the Association appointed Mr. Edward Whalen, a contractor and member of plaintiff Association to the Board of Directors. Mr. Whalen served from 1945 until his resignation in May, 1959, for reasons of ill health. Mr. E. E. McEldowney, a member of plaintiff Association until his resignation on August 1, 1959, was a

member of the Board of Directors of the Institute from 1945 until his resignation in 1958. Presently he is sitting on the Board of Directors as a replacement for Mr. Whalen. Mr. Michael Grady, a member of plaintiff Association until his resignation on May 13, 1959, serves as a member of the Board of Directors of defendant Institute and was appointed to fill the vacancy caused by the resignation of Mr. McEldowney in 1958. Both Mr. Whalen and Mr. McEldowney have served as President of plaintiff Association.

Mr. Edward McNulty, the present president of plaintiff Association, has been present at close to fifty per cent of the annual meetings of the Institute wherein the Institute auditor has read the Institute's financial report for that year.

Mr. Hylan Nolan, an independent plastering contractor in Cook County, Illinois, has served on the Board of Directors of the Institute since 1945 and has also served as secretary.

Mr. Thomas Courtney, an independent plastering contractor in Cook County, Illinois, has served on the Board of Directors of the Institute since 1945.

The evidence further shows that on numerous occasions when alleged illegal action was taken on the part of the Board of Directors of the Institute, plaintiff Association was represented at the meeting by its appointed representative directors. In fact, in most instances, employer representative directors were present at such meetings in the majority. I quote from Stipulation No. 1:

"24. The Minutes of a board of directors meeting of the Institute on May 4, 1948, show that Nolan, Luczak, Whalen, Courtney, McEldowney, Forst and Dalton were present and that the following among other actions was taken:

" 'On motion duly made and passed Mr. Byron Dalton was given full discretion in giving relief to needy beneficial members.' "

"25. The minutes of a board of directors meeting of the Institute on February 24, 1953, show that Nolan, Forst, Whalen, McEldowney, Luczak, Courtney and Dalton were present and that the following among other actions was taken:

" 'It was moved and passed that the officers be authorized and directed to lend $10,000 to the Plasterers' Union on its note without interest.' "

"31. The minutes of the board of directors meeting of the Institute on September 30, 1953 show that Luczak, Nolan, Forst, Whalen, McEldowney, Courtney and Dalton were present and that the following among other actions was taken:

" 'A proposal was submitted from the trustees of the Plasterers' Temple Building for a loan of $300,000 to be secured by a first mortgage on the Plasterers' Temple Building. On motion duly made and passed, the loan was approved.' "

"34. The minutes of the board of directors meeting of the Institute on July 8, 1954 show that Courtney, McEldowney, Whalen, Nolan, Luczak, Forst and Dalton were present and that the following among other actions was taken:

" 'It was moved and passed that the officers are authorized on behalf of the Institute to purchase certain acreage of land in Indiana for $32,-750; that the option to purchase the aforesaid land thereafter shall be given exclusively to the Ambassadors of Mary, Father Keane, or anyone in their behalf at an amount not exceeding that which the Institute has paid, plus interest accruing on current investments.' "

In the face of this record, plaintiffs argue:

(1) Plaintiffs were ignorant of these alleged illegal activities;

(2) Plaintiffs were not aware that payments made to the Institute pursuant to collective bargaining agreements were illegal until the case of United States v. Ryan, 1956, 350 U.S. 299, 76 S.Ct. 400, 100 L. Ed. 335;

(3) The public interest requires that the doctrine of "unclean hands" not be used to frustrate enforcement of the prohibitions of Section 302.

 As to plaintiff's first argument, it is a fundamental principle of law that a principal is charged with the knowledge of his agent acquired by the agent in the course of the principal's business. Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 222, 43 S.Ct. 570, 67 L.Ed. 956. Here plaintiff Association's *chosen* representative director Whalen was present at Institute director's meetings along with plaintiff's representative director McEldowney and other employer representative directors. Knowledge of Institute activities is clearly chargeable to plaintiffs. Furthermore, plaintiffs have not tried to explain the presence of these employer representatives on the Board of Directors, or offered any proof that they were mere puppets for Byron Dalton, nor have they called any of these men as witnesses. The most that can be said for plaintiffs' case is that McEldowney was once, over 40 years ago, Dalton's roommate and that there is certain evidence tending to show that Dalton is a powerful, influential man in the plastering construction business. There is no evidence to show that plaintiff representatives on the Institute Board of Directors have fraudulently deceived plaintiffs.

As to plaintiffs' second argument, I can sympathize with their misunderstanding the express terms of Section 302, "representative of any of his employees," until the decision of United States v. Ryan, supra. Even today, over ten years after the enactment of that Section, there is no clear exposition as to its meaning.

 I now consider plaintiffs' third argument. Section 302 is expressly violated if employer payments to representatives of employees are not within the five stated exceptions. No matter how carefully a fund is administered, if it does not meet the requirements of Section 302(c)(5), it is illegal. Plaintiffs cannot, in equity, be charged with knowledge that employer payments to the Institute were in violation of Section 302, because of the obvious difficulty in determining the meaning of "representative." However, plaintiffs can be charged with knowledge that the Institute funds in question were, as they allege, being used improperly. In my opinion, this knowledge, in light of the legislative history of Section 302, prevents them from invoking subsection (e). In reply to plaintiffs' argument that public interest demands the enforcement of Section 302 in this suit, it is clear that the public interest is protected, as Congress intended, by the Department of Justice.

I now consider the second issue presented the parties, namely, is the Institute a "representative" within the meaning of Section 302? I have tried in all my years on the bench to avoid the semantical entanglements of technical words. Most recently, I have expressed this philosophy in regard to the term "seaman" as used in the Jones Act, 46 U.S.C.A. § 688. Tuder v. Material Service Corp., D.C., 177 F.Supp. 71. I do not now propose to engage in a laborious analysis of definitions but feel, rather, that the answer to the above issue lies in the intention of Congress.

There is abundant evidence that Congress was somewhat perplexed with the term "representative" and its application in Section 302. 92 Congressional Record Pp. 4895–4900, 93 Congressional Record, p. 4748. The most relevant remark appears in 92 Congressional Record at page 4900, where Senator Byrd in speaking of his amendment states:

"The amendment is very clear. It prevents only the payment to a representative of employees. A joint fund could be set up and the payments could be made to the officials of the joint fund without payments being made to the representatives of the employees. To my mind there is a clear distinction. If a joint fund is set up by mutual agreement, the officials in charge of the joint fund are no longer the representatives of

the employees, and therefore will not come under the prohibition."

Apart from this general language, it is my opinion that the meaning of the term "representative" must necessarily vary in relation to the express aims of Congress. For example, if the theory of an action is to prevent union-management corruption, bribery or extortion, then the term "representative" takes on a narrow construction. This approach is substantiated by Arroyo v. United States, supra. However, if the theory of an action is to protect the funds of employees, then necessarily, the term "representative" must take on a broader construction because otherwise, any spurious trust fund could act to defeat the intention of Congress. Broadly construed, I would hold the term "representative" includes any type of employee welfare fund administrative arrangement, despite employer representation, where there is also union representation. I would hold the Institute in this cause to be a "representative" within the meaning of Section 302, and this Court would therefore have proceeded to adjudication of the issues involved had the cause been brought by a proper plaintiff.

In regard to the third issue presented the parties, it is apparent that the "Chicago Plasterers' Pension Trust," as evidenced by plaintiffs' Exhibit 160, is not properly before the Court and, in any event, on its face, the Pension Trust meets the requirements of Section 302.

The Benevolent Fund was negotiated by collective bargaining agreement entered into on October 25, 1945, and has existed continuously since that time. Section 302(g) provides:

"Compliance with the restrictions contained in subsection (c)(5)(B) of this section upon contributions to trust funds, otherwise lawful, shall not be applicable to contributions to such trust funds established by collective agreement prior to January 1, 1946 * * *."

In this regard, see the remarks of Senator Murray in 93 Congressional Record at Page 4749. In other words, is the Benevolent Fund of the Institute, "othwise lawful"? From the evidence introduced by plaintiffs one might, if the same were not satisfactorily explained on defendants' case, find that the Benevolent Fund is *not* "otherwise lawful."

As to the General Fund, it would seem that, in this regard, the Institute is not a "representative" within the meaning of Section 302, since the express purpose of such fund is not concerned with an employee welfare fund and thereby calls for a narrow construction of the term "representative." However, because of the discretion invested in the Board of Directors to distribute a variable amount of money between the Benevolent Fund and General Fund, I would be inclined to hold that the General Fund falls within the purview of Section 302.

As to the fourth issue, since the Institute administration of the General Fund does not comply with the express provisions of Section 302(c)(5), I would, it seems, have to hold that Section 302 is violated.

As to the fifth issue, Local 5 has submitted an amendment to Article 15 of the collective bargaining agreement dated June 1, 1956, which has allegedly been approved by many employers (Defendant Institute's Answer; Exhibit I). Local 5 has also submitted a new Health and Welfare Plan which has allegedly been accepted by many employers (Defendant Institute's Answer; Exhibit II). Finally, the Institute has amended Article 5 of its Certificate of Incorporation and its by-laws (Defendant Institute's Answer; Exhibits IV and V), the legality of which the plaintiffs contest.

These continued attempts by defendants to comply with Section 302 are, in my opinion, evidence of good faith. As heretofore mentioned, however, they probably would not in the light of the legislative history of Section 302 bar an action by *employees* under subsection (e) for relief in equity.

As to the sixth issue, it is my opinion that the legislative history clearly gives

me the right to grant the relief prayed for by plaintiff Association, in a proper suit by proper plaintiffs within the Court's jurisdiction.

As to defendant Institute's pending motion in Cause No. 59 C 726, I would hold that Quikbrik Co. made the payment of $8.25 to the Institute in August of 1952 (Transcript, Page 628) and that Quikbrik Co. was not a member of defendant Institute when this suit was filed. It is further my opinion that Quikbrik Co. does not adequately represent the actual members of the class it purports to represent.

For the reasons hereinabove set forth, I hold that neither Cause No. 59 C 726, nor Cause No. 59 C 779, "arises" under Section 302 or consequently, under Title 28 U.S.C. §§ 1331 or 1337. I hold that this Court is without jurisdiction to hear this consolidated cause.

Cause No. 59 C 726 is remanded to the Circuit Court of Cook County.

Cause No. 59 C 779 is dismissed.

The foregoing shall, in accordance with the provisions of Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C., stand as the Court's Findings of Fact and Conclusions of Law herein.