Application of Nathaniel M. MINKOFF, as Treasurer of Joint Board of Dress and Waistmakers' Union of Greater New York, an unincorporated association, Petitioner,

v.

SCRANTON FROCKS, INC., Richard Frocks, Inc., and Sherri Dress, Inc., Respondents,

To confirm the award of Harry Uviller, Esq., as Arbitrator, rendered pursuant to the terms of an agreement between Scranton Frocks, Inc. and Dress Makers' Joint Council, dated April 18, 1958, and pursuant to the terms of an agreement between Richard Frocks, Inc. and Dress Makers' Joint Council, dated April 18, 1958.

United States District Court
S. D. New York.
Feb. 19, 1960.

See also 181 F.Supp. 550.

with directions to remand to the Administrator for further proceedings. Flemming v. Lindgren, 275 F.2d 596.

544

Schlesinger & Bloom, New York City, for petitioner Emil Schlesinger, Max Bloom, New York City, of counsel.

Fellner & Rovins, New York City, for respondents Morris J. Fellner, Leonard W. Wagman, New York City, of counsel.

METZNER, District Judge.

Petitioner (hereinafter called the "Union") originally commenced a special proceeding in the Supreme Court of New York County to confirm an arbitration award rendered pursuant to the terms of a collective bargaining agreement between respondents (hereinafter called the "Contractors") and Dress Makers' Joint Council. New York Civil Practice Act, § 1461. This agreement was made on April 18, 1958, and among other provisions, it incorporated by reference the industry collective bargaining agreement between Dress Makers' Joint Council and the United Popular Dress Manufacturers' Association.

Contractors removed the proceedings to this court pursuant to 28 U.S.C. § 1441. Subsequently the Union moved to remand to the state court and Judge Palmieri denied the motion (D.C., 172 F.Supp. 870), holding that this court had jurisdiction under Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185(a), to confirm the award of the arbitrator made pursuant to the collective bargaining agreement.

Contractors oppose the motion for confirmation on the following grounds: (1) the moving papers are incomplete, (2) the Union breached and abandoned the contract that contained the arbitration clause, (3) there was no arbitration hearing, and (4) the arbitration award compels the payment of monies by the Contractors, which would be in violation of Section 302 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 186.

In Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, the court said:

"Other courts—the overwhelming number of them—hold that § 301(a)

is more than jurisdictional—that it authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements. * * * That is our construction of § 301(a), which means that the agreement to arbitrate grievance disputes, contained in this collective bargaining agreement, should be specifically enforced." 353 U.S. at pages 450, 451, 77 S.Ct. at page 914.

Following the decision of the Supreme Court in Lincoln Mills, supra, the Court of Appeals for this circuit in Engineers Ass'n v Sperry Gyroscope Co., 2 Cir., 1957, 251 F.2d 133, said:

"The section [§ 301] does not contain any guides for decision, and therefore, limited only by the policy of our national labor laws, we must fashion the applicable rules from other sources. 'State law, if compatible with the purposes of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy.' * * * Also, we may look to the Federal Arbitration Act which, though not binding upon us in suits brought under Section 301, * * * does provide a 'guiding analogy.'" 251 F.2d at page 136.[1]

Prior to the Lincoln Mills decision, the Court of Appeals for this circuit, on a motion to stay a suit for damages under a collective bargaining agreement because of the existence of an arbitration clause, held that Section 3 of the Federal Arbitration Act, 9 U.S.C., furnished the law for the proceeding. Signal-Stat Corp. v. Local 475, 2 Cir., 1956, 235 F.2d 298. In any event, Section 10 of the Federal Arbitration Act and Section 1462 of the New York Civil Practice Act have essentially the same grounds for objections to the confirmation of an arbitrator's award. Reference is made to the latter section not only because of the language in the Engineers Ass'n case, supra, but because of the wording in Paragraph 52 of the collective bargaining agreement, which states that the decision rendered by the Impartial Chairman:

"shall have the effect of a judgment entered upon an award made, as provided by the Arbitration Laws of the State of New York, entitling the entry of judgment in a court of competent jurisdiction against the defaulting party who fails to carry out or abide by [his decision]."

■ The Contractors' first objection that the moving papers are incomplete is frivolous in the extreme and warrants little comment. Both the arbitrator's award and the collective bargaining agreements are part of the moving papers before this court by reference to the exhibits attached to the moving papers submitted to the state court where this proceeding was originally instituted. Copies of all those papers were served on the Contractors. They have been filed with this court pursuant to the order of removal, and it would serve little purpose to require them to be set forth *in extenso* again to add to the already voluminous papers before the court on this motion.

■ The Contractors' second ground for opposing this motion is that there was no contract in force upon which the award could be founded. They assert that a strike which the Union called on June 24, 1958 was a breach of the contract which freed the Contractors from any further obligations thereunder.

The contract provides that:

"In the event of a substantial violation of this clause [no-strike clause] on the part of the Union, the Association shall have the option to terminate this agreement. The existence or non-existence of such substantial violation shall be determined by the Impartial Chairman on all the facts and circum-

1. For general discussion of this problem see 50 Columbia Law Review 153.

181 F.Supp.—35

stances." Paragraph 51, Collective Agreement, United Popular Dress Manufacturers' Association with I.L.G.W.U. and Dress Makers' Joint Council.

If the Union breached the agreement by calling a strike, the Contractors' remedy was to proceed to arbitration. This is what they contracted to do. A possible alternative was to give notice that they were exercising their option to terminate the agreement. Whether the Union could have successfully moved to compel arbitration of the efficacy of such a notice pursuant to the above quoted paragraph is a matter that need not be discussed at this time. See 8 Syracuse Law Rev. 243. Contractors took neither step, but rather engaged with some of their employees in picketing the Union offices. Nor did they raise the question of breach of the contract in the arbitration hearings which resulted in the award now before the court.

The actions of the Contractors subsequent to the calling of the strike further buttress the position that they considered the contract a subsisting one. They admit that the president approached a Union representative in July, 1958, asking for help to find a Union jobber so that they could comply with the agreement to take work only from a unionized jobber. Furthermore, notice of the present arbitration was given on December 10, 1958 and the president of the Contractors consented in writing on December 19, 1958 to an adjournment of the hearing and subsequently attended the hearing which led to the award here in question. The consent to the adjournment was written on a subpoena which clearly spelled out the nature of the hearing. None of these actions are consonant with the position that they were no longer bound by the agreement after June 24, 1958.

■ Contractors' assertion that the Union's expulsion of the workers of Scranton constitutes an abandonment of the contract misconceives the national labor policy as evidenced by the Wagner and Taft-Hartley Acts. Pepper & Potter, Inc. v. Local 977, United Auto Workers, C.I.O., D.C.S.D.N.Y.1952, 103 F. Supp. 684, was a suit by an employer for breach of contract by the union. The members of the union had repudiated their membership in it and the union had attempted to disavow its representative status. The court held that the exclusive means by which decertification of a bargaining representative might be accomplished was Section 9 of the National Labor Relations Act, 29 U.S.C.A. § 159, and consequently sustained the claim against a motion to dismiss.

■■ The Union here was the collective bargaining representative recognized by the Contractors. Its powers and responsibilities covered all production workers employed by manufacturers, contractors and jobbers in the Metropolitan District in contractual relations with the Union. The Union is still the representative of the employees and has not only the right, but the obligation to enforce the provisions of the agreement entered into for their benefit. In Steele v. Louisville & N. R. Co., 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, the court was dealing with the Railway Labor Act, 45 U.S.C.A. § 151 et seq., but the language is apposite here. The court said:

"The labor organization chosen to be the representative of the craft or class of employees is thus chosen to represent all of its members, regardless of their union affiliations or want of them." 323 U.S. at page 200, 65 S.Ct. at page 231.

While the employees of Contractors may no longer be members of the Union, they are bound by the vote of a majority of the employees in the bargaining unit as to their bargaining representative and to the contract entered into for their benefit. The benefits under the contract are not dependent upon Union membership, but rather on the status of the employees as being within the bargaining unit and, therefore, represented by the union chosen by the majority.

The Contractors' third objection is essentially that they were denied a full and fair hearing of the charges against them. The objection is couched in the language of subsections 1 and 3 of Section 1462 of the New York Civil Practice Act and the equivalent provisions of subsections (a) and (e) of Section 10 of the Federal Arbitration Act (9 U.S.C. § 10). The objection is based on the claim that the award was procured by fraud and undue means, that the arbitrator was guilty of misconduct in refusing to postpone the arbitration to give the Contractors sufficient time to prepare for the hearing, and that he refused to hear pertinent and material evidence. These grounds, if properly supported, would be sufficient to vacate the award. However, the documentary evidence and the affidavits submitted on this motion do not sustain the charges. It is asserted that no one for the Contractors was present on December 29, 1958 when the first hearing was held because "neither I [Failla, the president of the Contractors] nor anyone else connected with Scranton had any knowledge of any hearing on December 29th." Yet Failla was personally served with the notice of a hearing to be held on December 22nd (Exhibit 4 of the Union's motion papers). He also received a copy of the notice by registered mail. He also signed a stipulation to adjourn the originally scheduled hearing until the 29th of December (Exhibit 7 of the Union's motion papers). He does not deny having received the notice nor does he deny his signature on the stipulation. The court can only conclude that Failla either cannot or does not read what he signs or that he is being less than frank with the court.

Further, on page 8 of his affidavit he states that when the Union made a claim for breach of the collective agreement he consulted with an attorney, who is representing Contractors in this proceeding. His assertion that he came to the January 8th hearing with the understanding that it would be a round-table discussion and not an arbitration hearing seems made out of whole cloth in light of the previous information he had concerning the filing of the complaint with the arbitrator by the Union and his signing the subpoena consenting to the adjournment of the hearing. His further assertion, directly contradicted by the affidavits of Schlesinger, the Union attorney, and the other Union participants, that he was not given any opportunity to present evidence or cross-examine must be viewed in the same light. Contractors submit an affidavit of Angie Hartshorn, an employee, to substantiate their story as to what happened on January 8th. While Failla at least admits being present at the meeting, the employee says:

> "I remained in the meeting with Mr. Uviller and the other Union representatives until about 5 P.M. of that day. At no time during this meeting was Mr. William Failla present."

The last objection made to the confirmation of the award is that it allegedly orders payments which would violate Section 302 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 186. It seems clear that a federal court should not confirm an award which orders an act to be done contrary to federal law. Cf. Evans v. Hudson Coal Co., 3 Cir., 1948, 165 F.2d 970, 974; Western Union Telegraph Co. v. American Communications Ass'n, 1949, 299 N.Y. 177, 86 N.E.2d 162.

Section 302 makes it illegal for an employer to give money to any representative of his employees (subdivision a), and makes it illegal for any representative to receive any money from an employer (subdivision b). These provisions were aimed at preventing the creation of union slush funds and racketeering activities by a union or its representatives. See United States v. Ryan, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335; 59 Columbia Law Rev. 96 (1959). However, these prohibitions do not apply to any money paid to a trust fund for the benefit of employees, such as Health and

Welfare Funds or Retirement Funds (subdivision c(5)). In passing it should be pointed out that the section exempts from the taint of illegality payments made pursuant to an award of an arbitrator (subdivision c(2)), but such exemption cannot be conclusive against a showing that the award contemplates an act clearly within the prohibition of the statute.

■■■■ The award provides for payments by the Contractors to two funds, the Health and Welfare Fund and the Retirement Fund. The argument is made that the workers, having been expelled from the Union, will receive no benefits from the Funds and in fact have been denied benefits during the period for which the arbitrator ordered Contractors to make contribution. This argument comes with ill grace from Contractors who have failed to make any payments to the Funds for a substantial period prior to the expulsion of the employees. However, the question, after expulsion, is whether the Rules and Regulations of the Funds contravene the provisions of Section 302.

An examination of the Rules and Regulations of the Funds does not bear out Contractors' assertions. The Health and Welfare Fund provides that:

"(d) 'covered employer'—means any jobber, manufacturer or contractor in the Dress Industry under collective or independent agreement with the Union who, in pursuance thereof and in the amounts stated therein, makes payments, directly or indirectly, to the Fund on wages earned by the workers in the crafts covered by the agreement.

"(e) 'covered workers'—mean dress cutters and graders, operators, pressers, sample makers, drapers, finishers * * * *who are employed within the membership and shop jurisdiction of the Locals of the Union* and for whom their employer makes payments, directly or indirectly, to the Fund. * * * " (Italics added.) Article I.

The Retirement Fund defines in Article I "covered employer" and "covered workers" in substantially the same language except that it does not include the above italicized words. Contractors seek to rely on these italicized words to show that their employees because of expulsion from the Union cannot receive benefits from the Health and Welfare Fund. They point to the language of Section 302(c) (5), which requires that the monies be paid "for the sole and exclusive benefit of the employees of [the contributing] employer." While on first blush the italicized words do give the impression that Union membership is a condition of coverage, the explanation for this wording contained in the affidavit of the drafter of these rules and the structure of the Fund's benefit schedules satisfy the court that this was not the purpose of the wording. However, clarification of this wording would prove helpful for future interpretation. As is pointed out in the Union's affidavits, the Retirement Fund provides for uniform benefits throughout the Metropolitan District, while the Health and Welfare Fund, partly due to state law which gives varying benefits in the various states covered by the Metropolitan District, does not. Thus, the wording "within the membership and shop jurisdictions of the Locals of the Union" simply refers to the craft and geographical area of employment for purposes of determining the employee's benefits under the Health and Welfare Fund. Appended to the rules of the Fund before the court is the schedule for the Scranton District Council, which specifies the benefits to be paid to employees in that geographical area who work in the dress industry.

Similarly, the Contractors' attack upon the Retirement Fund fails. This Fund is solely for the benefit of employees in the dress industry. The definition of the "Locals of the Joint Board," Article I(c), is necessary to deal with the problem of the organization of the I.L.G.W.U. in areas outside of New York City where locals contain workers

in other industries besides the dress industry. Besides the fact that the explanations given for the wordings are wholly logical and convincing in light of the structure of the Union and the Funds, these explanations are contained in sworn uncontroverted affidavits which aver that the provisions are administered in a non-discriminatory manner.

Contractors point to letters sent to their employees on October 8, 1958, informing them of their expulsion from the Union, as proving that Health, Welfare and Pension benefits are being withheld. The letters specify that the employees will not be entitled to "any rights or privileges a good standing member of the union receives." There are rights, such as the right to vote for union officers, which flow from union membership. But as already discussed, union membership is not a condition precedent to the enjoyment of the rights here in question. On this point the court in Lewis v. Hixson, D.C., 174 F.Supp. 241, 252, said:

> "It may be true that the national policy of United Mine Workers requires a forfeiture of membership therein on the part of any member who works in a nonunion mine. That, however, is a matter between the Union and the individual member. There is nothing to indicate that a union member who so forfeits his membership becomes ineligible for the benefits of the trust fund so long as he continues to work either as a union member or a nonunion member for a coal operator who is signatory to the contract."

If there are denials of benefits from the Funds where an employee has met the requirements of the Funds for payment of benefits, the remedy is a suit by the employee against the Fund. See Hobbs v. Lewis, D.C.D.C.1958, 159 F.Supp. 282.

Contractors make a few further contentions as to the illegality of the Funds which can be disposed of briefly. They assert that the Health and Welfare Fund is not jointly adminis-

tered as required by Section 302. The Rules and Regulations specify the contrary. See Preamble, p. 2. In any event, since the Fund was created on March 6, 1944, the requirement of joint administration is not obligatory. L.M.R.A. § 302(g), 29 U.S.C.A. § 186(g). As to the contention that the Funds are required by Section 302 to provide vested benefits for the employees, Contractors cite no case or persuasive legislative history to indicate that such a requirement was ever intended. There is no reason to suppose that the general language of Section 302 was intended to deal with particular technical aspects of the mechanics of the Funds. The question of vested or nonvested benefits is bound up with such considerations as cost and level of benefits. The language of Section 302 would have to be much clearer to indicate that it banned a feature of many legitimate funds created both before and after the passage of Taft-Hartley. On the contrary, the indication is that the primary purpose of Section 302(a) was to prevent the building up of union slush funds, see 59 Columbia Law Rev., supra, and the Funds here involved can by no stretch of the imagination be considered anything other than legitimate plans to provide benefits for employees in the dress industry covered by the collective bargaining agreements. The preamble of the Health and Welfare Fund, for example, states that the monies are to be

> "held separate and apart from all other monies and funds of the Union. It is an irrevocable trust * * * [and none of the monies] can be used for any purpose other than those specifically enumerated in the collective agreements aforementioned and the rules and regulations adopted pursuant thereto."

The purposes of the Funds are those specified by Section 302 and the Contractors have pointed to no rule or regulation which violates the requirements of Section 302.

Motion granted. Settle order.