**In the Matter of SLEEP PRODUCTS, Inc., Bankrupt.**

United States District Court
S. D. New York.
March 15, 1956.

Rabinowitz & Boudin, New York City, for claimant-petitioner Local 140 Security Plan.

Meyer Lindenbaum, New York City, for trustee. Booth, Lipton & Lipton, Edgar H. Booth, New York City, of counsel.

Paul W. Williams, U. S. Atty., S. D. New York, New York City, for the United States. William Stackpole, New York City, of counsel.

Peter Campbell Brown, Corp. Counsel, New York City, for City of New York. Stanley Buchsbaum, Bernard H. Sherris and John J. Lyden, New York City, of counsel.

HERLANDS, District Judge.

## I.

The fundamental question raised on this proceeding involves the scope of the word "wages" as used in section 64, sub. a(2) of the Bankruptcy Act, Title 11 U.S.C.A. § 104, sub. a(2) [1] which grants priority to wage claims against a bankrupt. Do contributions required to be made by an employer to a union welfare fund pursuant to a collective bargaining agreement constitute "wages" within the meaning of that statutory provision, entitling a claim for such unpaid contributions to priority as a wage claim when the employer becomes bankrupt?

That question must be answered in the negative, for the reasons set forth in this opinion.

The claim involved is that of a union welfare fund known as the Local 140 Security Fund (referred to in this opinion as "the Fund"). The bankrupt-employer is Sleep Products, Inc. A collective bargaining agreement, dated August 15, 1952, had been signed by the employer and the Bedding, Curtain and Drapery Workers' Union, Local 140, of the United Furniture Workers of America, C. I. O.

(referred to in this opinion as "Local 140").

Pursuant to this agreement, the employer was required to make monthly payments computed at six percent (later six and one-half percent) of the gross monthly payroll of the employees in the bargaining unit. These payments were to be made to the Fund. For the three-month period immediately preceding the filing of the bankruptcy petition, the employer failed to pay $993.75 to the Fund; and that is the amount of the claim, as amended.

The trustee in bankruptcy moved before the referee to expunge and disallow the claim of the Fund as a priority claim for wages. The referee, by order dated November 16, 1955, granted the trustee's motion. The Fund is now appealing, seeking to review the order of the referee which disallowed priority to the Fund's claim. The United States of America and The City of New York, as tax creditors of the bankrupt employer, have appeared in support of the referee's order.

## II.

In order to obtain priority status as a claim for "wages," a claim must comply with the following explicit statutory requirements:

1. It must be a claim for "wages."

2. It may not exceed $600 "to each claimant".

3. It must have been "earned" within three months before the date of the commencement of the bankruptcy proceeding.

4. It must be due to certain specified classes of employees—"workmen, servants, clerks, or traveling or city salesmen on salary or commission basis."

"Wages" for which a prior claim may be made under the statute "are closely

---

1. **"§ 104   Debts which have priority**

"(a) The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be * * * (2) wages not to exceed $600 to each claimant, which have been earned, within three months before the date of the commencement of the proceeding, due to workmen, servants, clerks, or traveling or city salesmen on salary or commission basis, whole or part time, whether or not selling exclusively for the bankrupt; * * *."

circumscribed by express provisions of the Act," and each one of the statutory "qualifications must be satisfied before priority entails." Collier on Bankruptcy (14th Ed. 1941) p. 2083.

### III.

██ To determine whether the claim in this case satisfies the statutory definition, it is necessary to consider its origin and nature.[2]

The Fund was organized on August 1, 1950 under a trust agreement. By the terms of that agreement, the Fund undertook to finance various types of social insurance for employees in the bedding industry, including but not limited to life insurance, accident and health insurance, insurance for medical care and hospitalization, and disability benefit insurance.

Since the date of the Fund's organization, various employers have entered into collective bargaining agreements with Local 140. Such employers have been required to make contributions to the Fund, based on the gross monthly payroll of employees covered by said collective bargaining agreements.

On March 13, 1952, another fund, known as the Local 140 Pension Fund, was organized. This pension fund was created for the purpose of financing the payment of retirement pensions for employees in the bedding industry. The claimant Fund has been paying over to the pension fund certain portions of the moneys received from employers.

To be eligible for pension benefits, an employee must be employed by an employer who is covered by a collective bargaining agreement with Local 140, for a specified number of years prior to the date of retirement.

Under the express terms of the trust agreements setting up the claimant Fund and the pension fund, "neither the employer nor the individual employee have [sic] any right, title or interest in or to any part of the trust estate or fund so created, except such rights as might accrue to an employee under an insurance policy or for other welfare benefits" (Stipulation of Facts, "11".)

By virtue of the disability benefit insurance terms of the claimant's trust agreement, employers who have entered into collective bargaining agreements with Local 140, providing for contributions to the Fund, have received exemption from the State of New York from paying the taxes provided by the Disability Benefits Law, Workmen's Compen-

2. The pertinent portions of the collective bargaining agreement between the employer and Local 140 are the following:

"*Thirty-Second:* The employer hereby agrees, as long as this agreement remains in effect, to pay monthly on or before the tenth day of each month, a sum equal to 6% of the monthly gross payroll of the employees in the bargaining unit, to Local 140 Security Fund, for the purpose of financing a Security Plan for the benefit of the employees of the Employer within the bargaining unit. At the same time the Employer shall forward a report setting forth the figures upon which payment is based.

"Commencing February 15th, 1953, the Employer agrees to pay an additional one-half (½%) percent to the Local 140 Security Fund, the sum to be applicable to the Welfare provisions of the Security Fund, making it a total of six and one-half (6½%) percent.

"The employer further agrees to make the aforesaid monthly remittances to the Local 140 Security Fund at its offices and that each monthly payment shall be based upon the gross payroll of the employees in the bargaining unit for the preceding month.

"It is understood that the social benefits to be provided will meet the requirements of all applicable laws and will satisfy the Employer's obligations under the New York State Disability Law, without further obligation on the part of the Employer.

"It is agreed that Local 140 Security Fund will be administered in compliance with the provisions of all applicable laws."

"*Thirty-Third:* It is further understood and agreed that the Employer shall be under no obligation to see to the application of monies paid to the Local 140 Security Fund pursuant to this paragraph for the purposes and uses above mentioned."

sation Law, McK.Consol.Laws, c. 67, Article 9.

Under the express terms of the trust agreements setting up the claimant Fund and the pension fund, "no employee has an option to receive any part of the contribution of the employer in lieu of the insurance or pension benefits provided by the trustees" (Stipulation of Facts, "12").

No employee has the right to receive a cash consideration in lieu of the stipulated benefits, either upon the termination of the Fund or his withdrawal, through severance of employment or otherwise (Declaration of Trust, August 1 1950, paragraph "4"; Declaration of Trust, March 13, 1952, paragraph "4").

"The employer's contribution to the claimant is not subject to the payment of income and/or withholding taxes by the individual employee" (Stipulation of Facts, "13").

The collective bargaining agreement with Local 140 provides (paragraph "Thirty-Third") that "the Employer shall be under no obligation to see to the application of monies paid to the Local 140 Security Fund pursuant to this paragraph for the purposes and uses above mentioned." This paragraph also provides that, if the employer should fail to pay the moneys due to the Fund "the *Union* shall be entitled to liquidated damages in the sum of six (6%) per cent of the amount due in addition thereto." (Emphasis supplied.)

The tax treatment accorded the employer's contributions to the Fund indicates persuasively that such contributions are not to be treated as "wages" received by the employees. Individual employees are expressly exempted from paying an income tax on "contributions by the employer to accident or health plans for compensation (through insurance or otherwise) to his employees for personal injuries or sickness." Int.Rev.Code 1954, § 106, 26 U.S.C.A. § 106; C.C.H. Income Tax (1956) vol. 1, paragraph 1050, "Contributions By Employer To Accident And Health Plans."

The employer is not required to withhold at the source any portion of such contribution to the Fund. C.B.–1–1945, p. 90, I.T. 3738.

Nor can the employer's payments be construed as taxable to the employee on constructive receipt grounds. Income Tax Regulations, Reg. 118, § 39.42–2. Cf. Sloane v. Commissioner of Int. Revenue, 6 Cir., 1951, 188 F.2d 254, 261–262, 29 A.L.R.2d 580.

Moreover, the employer's contribution to the Fund is not deemed part of the employee's base pay for the purpose of computing social security taxes. Federal Insurance Contributions Act, 26 U.S.C.A. § 3101 et seq., section 3121(a) (2) provides:

"(a) Wages.—For purposes of this chapter, the term 'wages' means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash; except that such term shall not include—

\* \* \* \* \* \*

"(2) the amount of any payment (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment) made to, or on behalf of, an employee or any of his dependents under a plan or system established by an employer which makes provision for his employees generally (or for his employees generally and their dependents) or for a class or classes of his employees (or for a class or classes of his employees and their dependents), on account of—

"(A) retirement, or

"(B) sickness or accident disability, or

"(C) medical or hospitalization expenses in connection with sickness or accident disability, or

"(D) death; \* \* \*."

A realistic analysis of the benefits receivable by the employees from the Fund and their relationship to the Fund demon-

strates that the employer's contributions to the Fund do not constitute "wages" that are "earned" by and "due to" the employees. The benefits to be derived from the Fund by any individual employee are contingent and deferred. As between the employer and his employees, such benefits are indirect. Since the employer's contribution to the Fund is computed and deducted on a percentage basis with respect to the gross payroll, it cannot be said that the indebtedness of the employer for such contributions is "due to" or "earned" by any particular employee as a claimant.

The employer's contribution is due to the Fund pursuant to a contract. There is a relationship of debtor and creditor between the employer and the Fund. The obligation of such payment is not a debt to the individual employee; it is a debt to the Fund as a separate entity. The employee could not sue the employer if he failed to make payments to the Fund.

Furthermore, an employee has no proprietary or assignable interest in the Fund. If the employee has no property interest in the Fund and cannot sue to collect the contributions due from the employer to the Fund, it would be illogical and unrealistic to hold that the contributions due from the employer to the Fund can be deemed "due to" that employee.

The receipt of benefits by a particular employee from the Fund is contingent upon so many terms and conditions to be met by the individual union member that there can be no certainty that an employer's contributions to the Fund will ever be received by any one or more of his employees. It cannot be stated with even a fair degree of assurance that any of the employees of the employer will become entitled to any benefits under the Fund within a period representing three months prior to the date of the bankruptcy proceedings.

The indefinite, contingent and prospective receipt of benefits by the employees from the Fund, does not come within the principle of "wages" embodied in the Bankruptcy Act, the prime purpose of which was to enable marginal workers to obtain promptly the wages upon which their subsistence depended. That element of immediacy and urgency is the very antithesis of postponed insurance benefits.

In the light of the foregoing, it appears clearly that the unpaid contributions of the bankrupt-employer to the Fund do not qualify as a "wage" claim. This conclusion is fortified by a consideration of the legislative purpose of the statutory provision.

## IV.

The legislative intent underlying the priority given to certain types of wage claims is to furnish workers in the lower economic echelons with a protective cushion against the shock of their employers' bankruptcy. It has been reasoned [3] (1) that subordinate workingmen and menial servants depend for their subsistence upon their uninterrupted daily or weekly earnings; (2) that they have inadequate reserves to fall back upon when they are discharged by their employers' business failure and while they are seeking new employment; and (3) that their original choice of employment was relatively limited in scope and, therefore, it would be unrealistic and unfair to make them bear the full credit risk of their employers' bankruptcy.

Do these considerations of public policy and legislative purpose encompass an employer's unpaid contribution to a union welfare fund? I think not.

## V.

The word "wages" as used in section 64, sub. a(2) should be interpret-

3. Collier on Bankruptcy (14th ed.) vol. 3, par. 64.201; In re Paradise Catering Corporation, D.C.S.D.N.Y.1941, 36 F. Supp. 974; Blessing v. Blanchard, 9 Cir., 1915, 223 F. 35; Matter of Estey, D.C. S.D.N.Y.1934, 6 F.Supp. 570; Matter of Lawsam Electric Co., Inc., D.C.S.D.N.Y. 1924, 300 F. 736.

ed in its lay and colloquial meaning. It is used in the statute in a non-technical popular sense.[4] It is not "a term of art," nor does it have "a meaning of art."[5] For its interpretation and application, it does not depend upon administrative expertise. There is nothing in its statutory genesis to suggest that it was coined in the context of a specific economic problem or a special area of industrial regulation.[6]

We have been taught by Justice Holmes and Judge Learned Hand that a word is only "the skin of a living thought"[7] and that we must not make "a fortress out of the dictionary"[8], Justice Frankfurter has recently warned against making "of law too thin a dialectic enterprise."[9]

In that spirit, the courts have held that vacation pay, back pay and severance pay constitute "wages" within the coverage of section 64, sub. a(2).[10]

On the other hand, an employer's unpaid contribution to a union welfare fund has been held squarely to fall outside the priority "wage" claim provision of section 64, sub. a(2)[11] and an analogous provision of the New York

4. See In re Ko-Ed Tavern, Inc., 3 Cir., 1942, 129 F.2d 806, 809, 142 A.L.R. 357; In re Estey, D.C.S.D.N.Y.1934, 6 F.Supp. 570, 571. Cf. National Labor Relations Board v. Coca-Cola Bottling Co. of Louisville, Inc., 350 U.S. 264, 76 S.Ct. 383; United States v. Ryan, 350 U.S. 299, 76 S.Ct. 400.

5. Cf. Trans World Airlines v. City and County of San Francisco, 9 Cir., 1956, 228 F.2d 473, 475; Commissioner of Internal Revenue v. S. Frieder & Sons Co., 3 Cir., 1955, 228 F.2d 478, 480.

6. " * * * we hold that the Act is to be interpreted against its own background, * *. *." Learned Hand, Circuit Judge, in Loewi v. Ryan, 2 Cir., 229 F.2d 627, 629.

7. Towne v. Eisner, 1918, 245 U.S. 418, 38 S.Ct. 158, 159, 62 L.Ed. 372.

8. Cabell v. Markham, 2 Cir., 1945, 148 F.2d 737, 739, quoted by Judge Frank in United States v. Lennox Metal Manufacturing Co., 2 Cir., 1955, 225 F.2d 302, 311 and in Morgan v. United States, 2 Cir., 1956, 229 F.2d 291.

9. National Labor Relations Board v. Coca-Cola Bottling Co. of Louisville, Inc., 1956, 350 U.S. 264, 76 S.Ct. 383, 385.

10. Matter of Wil-low Cafeterias, 2 Cir., 1940, 111 F.2d 429, 432; Matter of Public Ledger, Inc., 3 Cir., 1947, 161 F.2d 762; McCloskey v. Division of Labor, etc., 9 Cir., 1952, 200 F.2d 402; In re Men's Clothing Code Authority, D.C.S.D. N.Y.1937, 71 F.Supp. 469. Cf. N. L. R. B. v. Killoren, 8 Cir., 1941, 122 F.2d 609, 137 A.L.R. 510, certiorari denied, 1941, 314 U.S. 696, 62 S.Ct. 412, 86 L.Ed. 556.

11. Matter of Brassel, D.C.N.D.N.Y., 135 F.Supp. 827, in which Brennan, Ch.J. said, in part:

"If contributions to a fund by an employer are to be construed as 'wages' and as covered by the provisions of Section 64, sub a(2) of the Act, its purpose of protection would be greatly weakened by present day conditions. A contribution of even a small percentage of the gross weekly payroll of a great number of employers would exceed the amount of $600 even in a single week.

"The ultimate contention here however is one of priority. Liberality of construction of the term 'wages' does not justify a nullification of the language of the statute which grants priority only to 'wages * * * due to workmen'. The employers' contribution here is never due to the employee. He may not enforce the employers' liability therefor. The employee never had an individual or assignable proprietory interest in the contribution or to the fund of which the contribution became a part. The discretion of the trustee in the administration of the fund is final and conclusive. The contributions here may be entirely exhausted by the expense of administration or by benefits allotted to union members possessing union seniority who never have been employed by a contributing employer. Here there is no claim of an assignment by the employees. It was not the intention of the section to afford priority protection to entire strangers. The claim is not entitled to priority."

See McKey v. Paradise, 1936, 299 U.S. 119, 123, 57 S.Ct. 124, 81 L.Ed. 75; Lane v. Industrial Com'r, 2 Cir., 1931, 54 F.2d 338, 340, 341, 86 A.L.R. 765; Samuels v. Quartin, 2 Cir., 1939, 108 F.2d 789, 791.

Cf. In re Flick, D.C.S.D.Ohio 1900, 105 F. 503.

Contra: Westbury Stylists, Inc., Bankrupt, Case No. 23058 (E.D.Penn., decided

Debtor and Creditor Law, McK.Consol. Laws, c. 12.[12]

## VI.

In reaching this conclusion, I have been mindful that the statute evinces a carefully drawn and delicately balanced pattern of priorities. This statutory distribution of credit risks in a set order of priorities reflects a legislative evaluation of competing economic and social interests. To grant priority status to the claim in this case would redesign the statutory pattern. There are no compelling circumstances to warrant that result.

## VII.

■ A statute granting priorities must be strictly construed.[13] The burden of establishing a right to preferential treatment under the statute as drawn rests upon the claimant. The claimant at bar has failed to sustain that burden.

All that the claimant has done is to indicate that there is room for rational debate before Congress for an amendment of section 64, sub. a(2).

Any basic change in the pattern of priorities should be accomplished by Congress and not by the courts. In the area of bankruptcy law, we are dealing with subject-matter the essential character of which is statutory in genesis and evolution.

Moreover, changes in section 64, sub. a(2) have, in the past, been accomplished by Congressional amendment.[14]

In the field of analogous state legislation, the term "wages" has been expanded by certain legislatures to include an employer's contribution to a union welfare fund.[15] Yet, even after such broadening of definition, the courts have confined that re-definition precisely within

May 16, 1950; not officially reported) per Referee Bachman, relying mainly on labor relations cases: Matter of 534 Catering Corporation, (S.D.N.Y., decided September 31, 1949; not officially reported) per Referee Joyce; In re Schmidt (S.D.Calif., decided December 2, 1953; not officially reported) per Referee Hunt, 24 C.C.H. Labor Cases, 85,004, paragraph 68,012.

12. Matter of Well Bilt Box Spring Corp. (Bayer) Sup. Ct., Kings Co., 1949, 196 Misc. 848, 89 N.Y.S.2d 768; Matter of Hollywood Commissary (Weintraub), Sup. Ct., Kings Co., 1949, 195 Misc. 441, 87 N.Y.S.2d 625.

Contra: In re Seaboard Furniture Manufacturing Corp. (Frey), Sup., 89 N.Y.S.2d 747.

Cf. Matter of Grigsby-Grunow, Inc., 7 Cir., 1935, 80 F.2d 478; Matter of Brooklyn Citizen, Sup.Ct., Kings Co., 1 Misc.2d 162, 165, 90 N.Y.S.2d 99; Ciarla v. Solvay Process Co., 3rd Dept.1918, 184 App.Div. 629, 172 N.Y.S. 426, affirmed 226 N.Y. 566, 123 N.E. 858; Sloat v. Rochester Taxicab Co., 3rd Dept.1917, 177 App.Div. 57, 163 N.Y.S. 904, affirmed 221 N.Y. 491, 116 N.E. 1076; Bryant v. Pullman Co., 3rd Dept.1919, 188 App.Div. 311, 177 N.Y.S. 488, affirmed 228 N.Y. 579, 127 N.E. 909.

13. When a wage priority is claimed under section 64, sub. a(2) of the Bankruptcy Act, "a strict construction must be placed thereon and the burden falls upon those

asserting a priority to establish that they come within the intended class." Matter of Paradise Catering Corporation, D.C.S.D.N.Y.1941, 36 F.Supp. 974, 975.

See In re Estey, D.C.S.D.N.Y.1934, 6 F.Supp. 570.

Cf. Guerin v. Weil, Gotschal & Manges, 2 Cir., 1953, 205 F.2d 302, 304.

14. The present language of the Bankruptcy Act provision bespeaks a slow and cautious evolution. Over the years, changes in this provision have been few and minor in character: to include salesmen; to enlarge the amount of the preferred claim from $300 to $600; and occasional shifts in the position of relative priority. These results have been accomplished by legislation. This is not the case of statutory "language from which one can get out as much as he cares to put in it." Circuit Judge Goodrich in Reed v. Pennsylvania Railroad Company, 3 Cir., 1955, 227 F.2d 810, 811.

15. Laws of New York, 1952, chap. 794, effective July 1, 1952, amending section 22 of the Debtor and Creditor Law, McK. Consol.Laws, c. 12 to include within the definition of "wages or salaries", the following, *inter alia:* "employer contributions to or payments of insurance or welfare benefits;" and "employer contributions to pension or annuity funds."

In California, the Legislature has imposed criminal sanctions for making the employer pay the contributions to a union welfare fund by providing that wilful fail-

the four corners of the amendment, declining to adopt a view that the particular change reflected a fundamentally new concept of "wages" for all purposes.[16]

## IX.

■ If the definition of wage claims within section 64, sub. a(2) is to be expanded, that result should be achieved by the method of Congressional amendment. That technique of law revision would afford the opportunity for full debate by labor unions, credit associations, bankruptcy law experts and others. It would permit Congress to adjust, deliberately, competing economic interests and conflicting social and public policies. It would avoid uncertainty in a relatively new and expanding field of management-labor relations, where there is no standardization in the form and character of union welfare funds [17] and where there is an absence of state regulation.[18] It would enable Congress to explore the impact of the suggested new definition upon the administration of such other statutes as the Taft-Hartley Act.[19]

Accordingly, the petition of the claimant is denied and the Referee's order is affirmed. Settle order on notice.

ure to do so is a misdemeanor. West's Ann.Cal.Labor Code, § 227, Deering's Labor Code, Cal.Ann., Statutes of 1955, ch. 1570 adding section 227 to the Labor Code, relating to payments by employers into employee benefit funds. This amendment provides:

"227. Whenever an employer has agreed with any employee to make payments to a health or welfare fund or other such plan for the benefit of the employees, or has entered into a collective bargaining agreement providing for such payments, it shall be unlawful for such an employer wilfully or with intent to defraud to fail to make the payments required by the terms of any such agreement. A violation of any provision of this section is a misdemeanor."

16. People v. Vetri, 1955, 309 N.Y. 401, 131 N.E.2d 568, reversing 2nd Dept.1955, 285 App.Div. 1089, 141 N.Y.S.2d 505.

17. There are literally hundreds of varying forms of union welfare, pension and retirement funds. Dearing, Industrial Pensions, The Brookings Institution (1954); U. S. Dept. of Labor, Collective Bargaining Provisions, Health, Insurance and Pensions (Bulletin No. 908–17); Rowe, Health, Insurance, and Pension Plans in Union Contracts, (U. S. Dept. of Labor, Bureau of Labor Statistics, 1955, Bulletin No. 1187); Brower, Pension Plans and Their Administration (National Industrial Conference Board, Inc., 1955); State of New York, Dept. of Labor, Division of Research and Statistics, Collectively Bargained Pension Plans in New York State (State of New York Pub., Bulletin No. 40, June 1950).

18. See The Mitchell-Hollinger bill (S.Int. No. 3296; A.Int. No. 3796) and the Mahoney-Dannegan bill (S.Int. No. 3061; A. Int. No. 3087) introduced in the 1956 Session of the New York State Legislature. These bills seek to regulate union welfare funds.

19. Labor Management Relations Act of 1947, 61 Stat. 136, § 302(c) (5), 29 U.S.C.A. § 186(c) (5). Cf. United States v. Ryan, 1956, 350 U.S. 299, 76 S.Ct. 400, where Mr. Justice Clark refers to "the welfare fund problem."