## In re SEVENTH AVENUE SOUTH, INC., t/a The Clothier, Debtor.

### Bankruptcy No. 7–80–00261.

United States Bankruptcy Court, W. D. Virginia, Roanoke Division.

April 13, 1981.

J. Albert Ellett, Roanoke, Va., for debtor.

J. Glenwood Strickler, Roanoke, Va., Trustee.

Bruce C. Ellett, claimant.

## MEMORANDUM OPINION AND ORDER

H. CLYDE PEARSON, Bankruptcy Judge.

Upon motion of the Trustee and the Debtor by counsel, a re-hearing was granted upon objections filed to claims No. 1 and 2 herein by Bruce C. Ellett claiming priority wages. This Court previously had ordered a priority upon said claims to the extent provided in 11 U.S.C. § 507(a)(3) of $2,000.00. Claim No. 1 was filed in the sum of $150.75 representing a final payroll check which failed to clear the bank and was returned to the former employee. Claim No. 2 was filed in the sum of $4,454.00 as priority representing commissions earned and unpaid.

Upon re-hearing the evidence appeared as follows: Bruce C. Ellett, employee of the Debtor, was engaged by the President of the Debtor, Richard Berrong, in the capacity as apparent chief representative of the Debtor in a subsidiary venture as a wholesaler for Cargo Fashions, Inc., 116 S. Long Beach Rd., Rockville Centre, New York 11570, in the areas of Virginia, North and South Carolina. The employee testified that she traveled extensively to New York and elsewhere in Virginia, North and South Carolina promoting the sale of apparel manufactured, produced or distributed by Cargo Fashions, Inc. In addition to the travel and exhibition of the merchandise at shows seeking sales to retailers the employee maintained the books and records of this subsidiary venture and from the evidence appeared to be substantially in charge of this operation. The employee commenced

services to the Debtor in this capacity in February or March of 1979 promoting through May sales of the "Fall line" of merchandise. She further testified that the sales activity was to some degree seasonal in that her duties were directed at promoting generally Spring, Summer and Fall line of this merchandise. She commenced her work in this capacity in January or February, 1979; that sales continued through the Summer, Fall and Winter of 1979 and that most of the commission set forth in Claim No. 2 was a result of sales in the first season made in the Spring of 1979 of the "Fall line". Following the demonstration and sale of the "Fall line" she had started working on the succeeding lines for the next season until the closing of the Debtor's business, and subsequently thereafter, the Chapter 7 petition was filed.

The employee filed with her claim, which was exhibited at the hearing and made a part of the evidence, a summary of the earnings from the sale of Cargo Fashions, Inc. merchandise. The statement reflects "season: Fall, 1979 Final Statement". The total gross was $159,937.00. Total clear orders to date $152,559.50. Total shipped full price $138,185.00. Total returns to date $8,758.00. Balance $129,426.70 less 8% sales discount $10,354.14, balance $119,072.56. Commission at 7% $8,335.08. Total written off price to date $22.87. Total shipped off price to date $19,122.00. Commission due at 3%—$573.66. Balance $8,908.74. The employee, Ellett, contends that under her agreement with Berrong, this balance of $8,908.74 was to have been divided 50–50 between Ellett and Berrong.

The Cargo statement further reflects an additional entry less draws to date: ($7,200.00), balance $1,708.74, balance due sample line $5,658.01, net balance due Cargo $3,949.27.

Mr. Berrong testified that he was the Chief Operating Officer of the Debtor in charge of its entire operation including subsidiary wholesale division representing Cargo Fashions, Inc.; that the $7,200.00 was paid to him and that Ellett would be entitled only to the one-half of the $1,708.74 amounting to $854.37 in addition to the $150.75 representing unpaid salary check returned to Ellett and failing to clear the bank. Ellett maintains, however, that her understanding was that the "balance line" reflecting $8,908.74 was the amount upon which she and Berrong had agreed to be divided 50–50 and that that sum should not be diminished by the amount of $7,200.00 which Berrong withdrew as his own income from the operation.

The testimony of Berrong was unclear and inconclusive as to the facts surrounding his arrangement with Ellett. This was particularly noticeable since he was President and Chief Operating Officer of the Debtor Corporation. When questioned as to his withdrawals of the $7,200.00, the witness responded that this sum was compensated with Ms. Ellett by the payment of her salary of $800.00 per month, however, Ellett's testimony was clear and explicit that the 50–50 division of the net balance was in addition to her salary.

▆ Crucial to the issue in this case is the time of the compensation earned within the purview of 11 U.S.C. § 507(a)(3).[1]

With respect to that question, the evidence was unclear as to the specific arrangements and payments thereon. Berrong testified that the commissions could not be paid, although earned and herein ascertainable until all records had been completed, credits given, along with returns and adjustments which would enable a final tally to be made of commissions earned due and payable; that he had not received from Cargo Fashions, Inc. any statement such as the one Ellett obtained and attached to her claim and exhibited evidence herein until

---

1. 11 U.S.C. § 507(a)(3).

"(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance and sick leave pay—
(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only (B) to the extent of $2,000.00 for each such individual."

after filing of the petition in this Court on March 12, 1980. Ellett testified that she obtained a statement from Cargo Fashions, Inc. after the petition was filed in order to document her claim to commissions. Berrong further testified that the computations after all adjustments would not have been available and, hence, commissions earned known until November or December of 1979. The evidence is unclear as to when the Debtor's business ceased. It obviously was prior to March 12, 1980 when the petition was filed. The file reflects the last inventory was made on January 30, 1980, however, Ellett's claim No. 1, which has evidence of the returned check attached thereto reflects that this check failed to clear after the business closed and the date upon this check evidenced by the bank's stamp returning the same to Ellett was February 8, 1980. It is reasonable to assume that the negotiation of the payroll check by Ellett and its journey through the banking channels to the Debtor's bank where it was rejected and thereafter returned to Ellett would have consumed at least a week or more. Consequently, the only evidence available seems to reflect that the business was closed in the latter part of January prior to the final inventory on January 30th. Assuming the business closed January 30th, ninety days prior thereto would have established a cut off date for wage priorities of approximately October 30th. Since Berrong testified that the accounting computation and determination of commissions due would not have been made until November or December, then the commissions would have been earned for that period and therefore, due and payable within the ninety day period.

Since the assets available in the hands of the Trustee are insufficient to reach general creditors the real issue before the Court is the priority to Ellett under 11 U.S.C. § 507(a)(3), *supra*. From the following facts and the law as hereafter appears, the Court concludes that Bruce C. Ellett is entitled to a priority payment of wages and commissions in the amount of $2,000.00 as provided in said Code section 11 U.S.C. § 507.

The philosophy surrounding priority payments ahead of other creditors in these proceedings generally deals with question of merit and deserving claims asserted against the estate. Generally it has always been a priority in bankruptcy proceedings, as well as common law proceedings that administrative expenses in processing and concluding a case must be first paid. *See* 3 *Collier on Bankruptcy* (15th Ed.) § 507.01 over the years wages of workmen and employees have been accorded a priority ahead of other creditors in relative positions. At one time the priority of wages was in fifth place. Later they were moved up to second place under *The Bankruptcy Act of 1898* 11 U.S.C. § 104. *The Bankruptcy Code of 1978* 11 U.S.C. § 507 places wages and commissions in third place subordinate only to administrative expenses and costs and administrative claims under 11 U.S.C. § 502(f) incurred post petition.

■ In construction of code provisions relating to wage priorities courts have liberally construed the statutes to accord possible intent of Congress by giving broad meaning to the provisions of the Code as to relate to the facts rather than narrow restrictive meanings. *See NLRB v. Killoren* (8th Cir. 1941) 122 F.2d 609 cert. den'd, 314 U.S. 696, 62 S.Ct. 412, 86 L.Ed. 556.

In 3A *Collier on Bankruptcy* (14th Ed.) § 64.202 at page 2120 is set forth an excellent statement of broad liberal construction which courts must give to the statute establishing wage priorities.

"If this provision had been restricted to 'workmen' and 'servants', it might perhaps be urged that 'wages' should be construed in its narrow and popular sense as meaning the payment of a fixed sum per day, week or month for manual labor, or other labor of a menial or mechanical kind. But since this provision also includes 'clerks' and 'traveling or city salesmen', if we construe 'wages' in this narrow sense we necessarily limit the operation of the statute to those clerks and traveling salesmen who happen to be paid for their services in a particular way; in

other words, the question of preference [priority] is made to turn upon the mode of payment rather than upon the kind of service rendered. The result would be that a clerk who was paid a fixed sum per day, week, or month, which during the year amounted to $1,000.00, would be entitled to a preference, while a clerk who was paid this sum in the form of a yearly salary would be excluded; and, further, a traveling salesman who was paid a fixed sum . . . would be entitled to a preference, while a traveling salesman who only earned . . . commissions would be excluded. It is plain, therefore, that 'wages' must be construed in its broader and more general sense as meaning compensation for services rendered, since to hold otherwise would level to glaring inconsistencies and manifest injustice."

"There is nothing ambiguous about the use of the word 'wages' in this connection. It means the agreed compensation for services rendered by the workmen, clerks, or servants of the bankrupt—those who have served him in a subordinate or menial capacity and who are supposed to be dependent upon their earnings for their present support. Whether their employer has agreed to pay them by the hour, the day, the week, the month or by the 'job' or piece is wholly immaterial. "It is incredible to suppose that Congress intended to discriminate against the vast army of laborers who, in the coal mines, the foundries, the clothing manufactories and in almost every branch of industry, are paid, not according to the time consumed, but according to the work accomplished."

It must be determined that the commissions were "earned" within the purview of 11 U.S.C. § 507 when the computation was finally made and the total commissions arrived at therefrom. It would be totally unrealistic to attempt to allocate total commissions due and prorate the same for the months in question. We are not here dealing with theoretical income due this employee which may have been computed to be due her during the year. We are concerned with the practical application of the priority statute and a realistic computation of commissions due and payable to an employee. It goes without saying that this Court finds that the agreement between Berrong and Ellett provided for a division of the commissions as contended by Ms. Ellett, being the sum of $8,908.74. To do otherwise would be to permit Mr. Berrong to allocate to himself such salary or "draws" as he may deem appropriate which would diminish any compensation due such employee for realistic commissions for her services rendered.

As set forth in the foregoing citation, it matters not that the wages or commissions are payable by the hour, day, week, month or job. It is the reasonable and logical construction given to the facts in question. Here the commissions arose at some point during the period of January, 1979 to December, 1979, but their ascertainment could not be made until all factors were in and, therefore, the commissions were due and payable in November or December according to Berrong who was the Chief Operating Officer of the Debtor corporation.

Congressional intent reflecting a liberal construction is further demonstrated by the increase of priority wages provided in *The Bankruptcy Act of 1898*, 11 U.S.C. § 104 of $600.00, which was increased in *The Bankruptcy Reform Act of 1978* to $2,000.00. Therefore, the employee here is entitled to priority wages without question, in the sum of $150.75 plus commissions earned in a sum sufficient to total $2,000.00 as provided by statute. It is so ORDERED.