**In re PITTSTON STEVEDORING CORP., Debtor.**

**Bankruptcy No. 81 B 12025.**

United States Bankruptcy Court,
S.D. New York.

May 24, 1984.

Shaw, Goldman, Licitra, Levine & Weinberg, P.C., Garden City, N.Y., for debtors; Karen Carter Caso, Garden City, N.Y., of counsel.

Lambos, Flynn, Nyland & Giardino, New York City, for NYSA–ILA Fringe Benefits Fund Shipping Industry Ins. Trust; Peter C. Lambos, New York City, of counsel.

Thomas W. Gleason, New York City, for NYSA–ILA Fringe Benefits Escrow Fund, Susan G. Barres, New York City, of counsel.

BURTON R. LIFLAND, Bankruptcy Judge.

The debtor in this proceeding, Pittston Stevedoring Corporation ("Pittston"), filed a petition for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978 ("the Code"). A creditor, The Fringe Benefit Escrow Fund ("FBEF"), is claiming that contributions to an employee benefit plan, which Pittston admits it owes to the FBEF, should be granted priority status under Section 507 of the Code. Under Section 507(a)(4) of the Code, a priority claim for contribution to such a plan must have "arisen from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first".

The primary issue presented by Pittston's motion to expunge, reduce or reclassify the claims of FBEF is whether Section 507(a)(4) of the Code grants priority status to a claim for contributions to an employee benefit fund when the debt does not arise from services rendered within the 180 day period, but rather was discovered during an audit performed by the creditor within this 180 day period. The creditor espouses in the alternative, though less forcefully or clearly, that the money was "earned" within the meaning of Section 507(a)(3) of the Code when the debt was discovered during the audit, and should therefore be granted priority status as a claim for wages. Under this section, a claim for wages must be earned within "90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first," for priority status to be granted. The creditor thus attempts to meld Section 507(a)(3), which deals with employee benefit plans, with Section 507(a)(4), which deals with wages.

I. *Factual Background*

Pittston was a member of the New York Shipping Association, Inc. ("NYSA"), a bargaining association consisting of employers of longshore laborers in the Port of New York and its surrounding vicinity. The longshore laborers are represented by the International Longshoreman's Association ("ILA"). Because of its membership in the NYSA, Pittston was a party to the NYSA–ILA Collective Bargaining Agreement which contained the NYSA–ILA Tonnage Assessment as one of its provisions. The Tonnage Assessment provides that the direct employer of ILA labor, in this case Pittston, shall collect from carriers who use ILA labor an assessment which will be transmitted to the FBEF, the creditor in this bankruptcy proceeding. The FBEF is a labor-management trust fund, organized under the provisions of the Taft-Hartley Act, which serves as a depository for assessments collected from various carriers and contracting stevedore employers who are covered by NYSA–ILA collective bar-

gaining agreements. If a direct employer of ILA labor, such as Pittston, performs work for a carrier which is not a party to the collective bargaining agreement, and therefore is a party from which Pittston cannot collect the Tonnage Assessment, then the direct employer shall be responsible for the assessment. A direct employer may nonetheless escape liability for this payment if it secures an agreement, known as a subscription agreement, from the non-member carrier requiring the non-member carrier to make the payment to the FBEF.

On February 22, 1978, the vessel *Fonnes* sailed from Pittston's marine terminal in Newark, New Jersey. Because the carrier was not a party to the NYSA–ILA collective bargaining agreement, and Pittston failed to secure a subscription agreement from the carrier, Pittston remained liable for the amount owed under the Tonnage Assessment. The amount due under this assessment constitutes Claim No. 51 in this proceeding. On March 3, 1978, the vessel *Mistral Del Norte* sailed from Pittston's Newark, New Jersey marine terminal. On December 31, 1978, the vessel *Busturia* also sailed from Pittston's Newark, New Jersey terminal. Because Pittston failed to procure a subscription agreement from the owners of these two vessels, neither one being a party to the NYSA–ILA Collective Bargaining Agreement, Pittston became responsible for these payments under the provisions of the Tonnage Assessment Agreement. The amount owed by Pittston arising from the passage of the vessels *Busturia* and *Mistral Del Norte* constitutes claim No. 54.

Pittston filed a petition under Chapter 11 of the Code on October 19, 1981. The FBEF conducted an audit of Pittston's books and on September 23, 1981, it discovered that Pittston had underreported the hours worked by ILA laborers on the vessel *Fonnes*. The underreported hours regarding the *Fonnes*, which form the basis of claim No. 51, give rise to a liability on the part of Pittston in the amount of $5,646.96. On May 11, 1981, the FBEF auditor also discovered that Pittston had underreported the hours worked by ILA laborers on the Vessels *Mistral Del Norte* and *Busturia*. The underreported hours on these two vessels, which form the basis for claim No. 54, give rise to a liability of Pittston in the amount of $7,911.91. It is the priority status of these two claims which is at issue in this proceeding.

## II. *Discussion of law*

While the issue presented herein is one of first impression, the paucity of precedent regarding this issue is more properly attributable to the clarity with which the Code deals with this issue than to its presentation of a complex or novel legal perplexity. Section 507 of the Code enumerates which expenses and claims shall have priority in the distribution of the debtor's estate. To reiterate, Section 507(a)(4)(A) of the Code provides that priority status should be afforded to claims to employee benefit plans when such claims have *arisen* "from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first...." 11 U.S.C. 507(a)(4)(A) (1983) (emphasis added).

It is abundantly clear from the language of the Code that the event which triggers priority status for a claim for contribution to an employee benefit plan is the performance of that employee's services and not the discovery of the claim for such contribution. As the parties agree, the date from which the 180-day period should be calculated is October 19, 1981, the date Pittston filed a petition for bankruptcy. Because the services rendered which gave rise to the claims now in issue were clearly performed before the relevant 180-day period, these claims are not entitled to priority status as contributions to an employee benefit plan under Code Section 507(a)(4).

Similarly, Section 507(a)(3)(A) of the Code provides that claims for salaries, wages, and commissions which were *earned* "within 90 days of the date of filing are to be granted priority status." 11 U.S.C. § 507(a)(3)(A) (1983) (emphasis added). The FBEF asserts that the amounts owed

by Pittston were "earned" when discovered during the audit of the debtor's books. This argument, if it were to be accepted, requires two conclusions which are contrary to explicit provisions of the Code. First, the debt owed would have to be classified as one for wages. To accept this conclusion, it would be necessary to ignore Section 507(a)(4), which explicitly provides for the priority treatment of contributions to employee benefit funds.

Secondly, and perhaps more importantly, if the claims due are construed as wages, they would have to be considered as having been "earned" when they were discovered upon audit by the FBEF. This interpretation would distort the meaning of the word "earned" and would defeat the clear import of the wording of Section 507(a)(3)(A) of the Code. This section limits the pool of wage claims which will be given priority status by explicitly providing that these claims must have been "earned", not discovered, calculated, or otherwise stumbled upon during an audit within 90 days of the filing of the petition. Were this Court to grant priority status to any claim discovered during an audit performed at any point not necessarily within the statutorily required time period, Section 507 would be unjustifiably transformed into a provision which rewards timely accounting by a creditor, rather than fulfilling the former Bankruptcy Act's objective in enacting wage priorities, which objective essentially is carried over into the Code. This objective is to give "a special protection *in a limited amount* to workmen who by reason of the amount of their remuneration would ordinarily be expected to depend upon their daily, weekly or monthly wage for their support and the support of their families." *In re Brassel*, 135 F.Supp. 827, 829 (N.D.N.Y.1955). *See also In re Sleep Products, Inc., Bankrupt*, 141 F.Supp. 463 (S.D.N.Y. 1956), *aff'd*, 242 F.2d 375 (2d Cir.1957); *In*

*re Paradise Catering Corp.*, 36 F.Supp. 974, 975 (S.D.N.Y.1941); 3A Collier on Bankruptcy ¶ 64.201 at 2113 (14th ed. 1975) (declaring that wage priorities which are based on "considerations of social policy" are "closely circumscribed" by express provisions of the Act).

While it is true that one court has expressly noted that priorities for wages should be broadly construed,[1] *see In re Seventh Avenue South, Inc.*, 10 B.R. 289, 291–92 (Bkrtcy.W.D.Va.1981), this case was decided in a wholly different context. The FBEF mistakenly asserts that *In re Seventh Ave. South, Inc.*, 10 B.R. 289 (W.D. Va.1981), where the court held that a sales commission was earned when the final computation was made and the amount owed was determined, is analogous to this case and compels this Court to grant priority status to its claim. However, this case is distinguishable on two grounds.

First, *Seventh Avenue South* deals with a claim for commissions and is therefore controlled by Section 507(a)(3) and not 507(a)(4) as is the instant case. Congress specifically included Section 507(a)(4) in enacting the Bankruptcy Reform Act of 1978 as a new provision designed to create a separate priority for claims based on contributions to employee benefit plans. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 187 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess. 69 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787. In contrast, Section 507(a)(3) deals explicitly with commissions and provides that those which are earned within a certain period are entitled to priority. The use of the word "earned" in Section 507(a)(3) thus allows for some variation according to agreements between employers and employees concerning, *i.e.*, commissions, whereby it is not unreasonable to conclude that a commission was earned when calculated. However, Section 507(a)(4) is not susceptible to the varying

---

1. No mention of a generalized rule of broad construction is contained in the other case cited by the FBEF for the proposition that wage priorities are to be construed broadly, *In re Missionary Baptist Foundation of America*, 12 B.R. 570, 573 (Bkrtcy.N.D.Tex.1981), *aff'd*, 667 F.2d

1244 (5th Cir.1982). In any event, *Missionary Baptist* concerns the very different issue of whether a supermarket may be subrogated to the priority status of wage claimants when it cashes the debtor's worthless paychecks.

interpretations to which Section 507(a)(3) is susceptible. Contributions to employee benefit funds under Section 507(a)(4) must arise "from services rendered" within a certain period. The services rendered in this case were not performed within that certain 180-day period.

Second, commissions are wholly distinct from contributions to employee benefit plans insofar as pinpointing their date of accrual. The pivotal factor motivating the court in *Seventh Avenue South* to date the point of "earnings" in that particular case as of the date the commissions were calculated (based apparently on the particular labor contract between those parties) was that they could not have been calculated earlier on. The court declared: "Here the commissions arose at some point during the period of January, 1979 to December, 1979, but their ascertainment could not be made until all factors were in in and, therefore, the commissions were due and payable in November or December." In contrast, in the instant case, the amount of the unreported contributions to the employee benefit plan could easily have been calculated months before the priority period began had the FBEF undertaken an audit at any earlier point. This is because the underreporting occurred months before the priority period began. Thus, *Seventh Avenue South* is wholly distinguishable from the instant case because: (1) commissions are to be construed under the specific subsection dealing with wages; (2) the point at which commissions are "earned" can vary depending upon the particular contract between the parties at issue; and (3) the amount of underreported contributions here could easily have been ascertained before the onset of the priority period.

■ In any event, even a canon of construction favoring a broad interpretation does not militate in favor of so wide an interpretation as to render explicit provisions of the Code meaningless. Indeed, that a statute is to be liberally construed does not authorize redrafting its unambiguous language. *See In re Bartley*, 33 B.R. 768, 771 (Bkrtcy.E.D.N.Y.1983).

■ In addition, there is longstanding authority for·the proposition that words of a statute should be afforded their plain narrow meaning, especially in the area of wage priorities. *See In re Sleep Products, Inc., Bankrupt*, 141 F.Supp. 463 (S.D.N.Y. 1956); *In re Paradise Catering Corp.*, 36 F.Supp. 975 (S.D.N.Y.1941). In *Sleep Products, supra*, the District Court for the Southern District of New York declared: "A statute granting priorities must be strictly construed. The burden of establishing a right to preferential treatment under the statute as drawn rests upon the claimant." *Id.* at 469. That court also stated that the term wages "should be used in its lay and colloquial meaning. It is used in the statute in a non-technical popular sense." *Id.* at 468. The issue facing that court—whether contributions to employee benefit plans are "wages" entitled to priority—has since been resolved by legislative amendment pursuant to the Bankruptcy Reform Act of 1978. The drafters of the Reform Act included Code Section 507(a)(4) specifically to overrule the body of cases which had previously narrowly construed wage priority to exclude these contributions. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 187 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 69 (1978) (declaring that *United States v. Embassy Restaurant, Inc.*, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601 (1959), where the United States Supreme Court declined to include contributions to employee benefit plans as wages, is specifically overruled).

■ Thus, it is abundantly clear that a broadening of the contours of the Code section dealing with wage priorities cannot be undertaken by judicial fiat. Rather, this expansion must be accomplished by legislative modification. *See In re Sleep Products*, 141 F.Supp. at 470, where the Court declared:

"If the definition of wage claims within Section 64, sub. a(2) is to be expanded, that result should be achieved by the method of Congressional amendment. That technique of law revision would afford the opportunity for full debate by

labor unions, credit associations, bankruptcy law experts and others. It would permit Congress to adjust, deliberately, competing economic interests and conflicting social and public policies...."

Similarly, in declining to expand wage priorities to include contributions to union welfare funds, the District Court for the Northern District of New York in *In re Brassel, supra,* declared: "Liberality of construction of the term 'wages' does not justify a nullification of the language of the statute which grants priority only to 'wages ... due to workmen.'" 135 F.Supp. at 830. And, in *Paradise Catering Corp., supra,* the District Court for the Southern District of New York declared: "Where statutes involving priorities are in issue, a strict construction must be placed thereon and the burden falls upon those asserting a priority to establish that they come within the intended class." 36 F.Supp. at 975.

 In addition, a fundamental canon of statutory construction observed generally by various courts dealing with both nonbankruptcy and bankruptcy issues is that, unless otherwise defined, words will be interpreted according to their ordinary, contemporary, common meaning. *See, e.g., Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *Burns v. Alcala,* 420 U.S. 575, 580–81, 95 S.Ct. 1180, 1184, 43 L.Ed.2d 469 (1975); *In re Noggle,* 30 B.R. 303, 305 (Bkrtcy.E.D. Mich.1983). Other courts have expressed this same affinity for the primacy of the plain meaning of the words used in a statute in declaring that analysis "must begin with the language of the statute itself ... and absent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Bread Political Action Committee v. Federal Election Committee,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982) (citations omitted). *See Consumer Product Safety Commission v. G.T.E. Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *In re Co Petro Marketing Group, Inc.,* 680 F.2d

566, 570 (9th Cir.1982) (interpreting provisions of the Bankruptcy Code). As there is no legislative history supporting the FBEF's contrary construction, this Court's inquiry need proceed no further than the plain meaning of the words used in Code Section 507(a).

In the instant case, the plain meaning of both the words "arising" and "earned" compels this Court to pinpoint the date at which these debts were incurred as previous to the statutory priority period.

## III. CONCLUSION

This Court concludes based upon the foregoing analysis that the debt owed to the FBEF by Pittston does not qualify as a priority claim under Section 507 of the Code. Pittston's motion for reclassification of claims is therefore granted and Claims 51 and 54 will be reclassified as general unsecured claims.

It is SO ORDERED.